(No. 61062.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JEFFREY D. PARMLY, Appellant.

*Opinion filed May 22, 1987.—Rehearing denied October 5, 1987.*

CLARK, C.J., specially concurring.
SIMON, J., joining in Part II of Chief Justice Clark's specially concurring opinion.

Charles M. Schiedel, Deputy Defender, and Robert D. Seeder, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Roma J. Stewart, Solicitor General, and Mark L. Rotert and Scott Graham, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE SIMON delivered the opinion of the court:

A jury in the circuit court of Marion County found the defendant, Jeffrey D. Parmly, guilty of one count of murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)(2)) and one count of felony murder (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(a)(3)) in connection with the killing of L. D. Young. The same jury found the defendant eligible for the death penalty. The defendant elected to have the trial judge alone hear the evidence in aggravation and mitigation, and the jury was then dismissed. After hearing that evidence, the judge sentenced the defendant to death. The case is before us pursuant to the constitutional provision for automatic review in cases in which the death penalty has been imposed. Ill. Const. 1970, art. VI, sec. 4(b).

L. D. Young, who suffered from a number of serious physical disabilities, including the amputation of both his legs below the knees, was found dead on May 12, 1984, inside his home in rural Marion County. He had been

beaten and had also sustained a gunshot to the head from a .22-caliber pistol and another shot to the neck. A pathologist testified that the close-range shot to the head was fatal and that Young did not die from the shot to the neck. Pieces of broken ashtrays were found near Young's body, and blood was detected in various places. A .38-caliber pistol, in a snapped holster, was found underneath his body, and the body had been moved after death. Young's truck, a .22-caliber pistol, and his wallet were missing, and his safe was open when police arrived at the scene.

The police learned from Charlie Voss that he, Larry Foutch, and Richard Cook had discussed burglarizing Young's house both on Wednesday, May 9, and later on Friday, May 11. Voss, Foutch and Cook set out for the victim's house on May 9, although Cook turned back before getting there. Voss and Foutch gained entrance to Young's house on a pretext of needing a ride back to town, they talked with Young, and Young eventually drove them himself. Several hours later, believing that Young had left his house, Voss and Foutch returned to the vicinity but found that Young was still there. On Friday, May 11, after spending considerable time walking around, drinking, and talking, Foutch and Cook determined to return to Young's house to burglarize it; Voss, however, went home.

Acting on Voss' information, the police apprehended Cook. Cook gave a statement to the police implicating himself, the defendant, and Foutch. Cook eventually pleaded guilty to armed robbery and received a sentence of 10 years in return for his testimony.

Cook was the star prosecution witness at the defendant's trial. Cook was a good friend of Voss and had known Larry Foutch for seven or eight years. Cook substantially verified Charlie Voss' testimony as to the pre-existing plan to burglarize Young's house and as to the

events of the evening of May 11 up to the time Voss departed. Cook added that he and Foutch had gone to Young's on Thursday, May 10, but left when it appeared that Young was home.

Cook first met the defendant on Friday, May 11 at Hap's Arcade. At some point the defendant was advised of the plan to break into Young's home and, according to Cook, said that if they went there, to pick him up at the Depot Lounge first. Later in the evening, Jerry Patten and his brother, Walter, dropped Foutch, Cook, and the defendant off in the rural area in which Young lived.

Cook testified that, after being dropped off, the three walked down some railroad tracks, cut through a field, and then through an abandoned house, ending up on the road in front of Young's house. They talked over breaking into the house; when car lights appeared they hid behind a tree for several minutes. The three then walked down the road to see if other cars were coming.

When they arrived at Young's house, they again discussed breaking in. Either Foutch or the defendant knocked on Young's door, and a light came on. Young let them into the house after being told they had been stranded in the country by some girls. Young did not have his artificial legs on. Cook tried to make a phone call, but hung up when he could not think of anyone to call. The defendant also attempted to make a phone call.

After they had conversed for about 30 minutes (according to Cook it was 1:30 a.m.), Young suggested that the three could probably get a ride at the Banks Bowl nearby. Foutch, Cook, and the defendant then left the house, but the defendant asked to use the phone again, and he and Foutch reentered. Cook was standing in the road and heard "scuffling" from inside the house. After about two minutes, he heard two gunshots. The defendant came running out, followed by Foutch. There was blood on the defendant, and he was carrying a gun. One

of the two told Cook that Young was dead, and they all three ran across a field until they hit an electric fence. The defendant suggested that they go back to wipe off fingerprints and get the money. When Cook said he did not want any part of it, the defendant put the gun to his head, but Foutch talked him out of doing anything.

According to Cook, they returned to Young's house and attempted to remove fingerprints. The defendant grabbed Young's wallet and keys and opened the safe, which turned out to be empty. Foutch went through the victim's dresser and took some coins. The three then took Young's truck. After they had proceeded about a mile, the defendant stated that he had left his jacket and sunglasses at the scene, and they once again returned to Young's house. After the defendant secured those items, they left the scene.

Prior to trial, the defendant moved to prevent Cook from reciting any hearsay statements made to him by Foutch the day after the incident on the grounds that such declarations were not within the co-conspirator exception to the hearsay rule and that their admission would deprive the defendant of his sixth amendment right to confront Foutch. The trial judge denied the motion *in limine*. Cook was permitted to testify that he saw Foutch the day after the killing, and told Foutch that if questioned by the police, he "wasn't going to hold nothing back." Foutch told him not to talk and advised him to be calm. Foutch then related what happened inside Young's house after Cook had left. As repeated by Cook at trial, Foutch said that the defendant had kicked Young in the head and then wrestled with him. Foutch hit Young on the head with an ashtray. Foutch then took a gun and shot Young once. The defendant obtained the gun and "finished him off" by putting the gun to Young's head and firing. Cook testified that Foutch told him Young was still alive after the first shot.

Foutch, who pleaded guilty in a separate proceeding, did not testify at the defendant's trial. In addition to Cook, various police officers and forensic experts testified, and the State also called Hershel Hull, who worked for Young and who discovered his body on May 12. Hull stated that several weeks before the killing, the defendant and Foutch had come to his house attempting to sell him "some stuff."

Several defense witnesses placed the defendant at a party on the evening of May 11, but this testimony was not inconsistent with the defendant being at Young's house at the time of the killing. James Miller, a friend of both Foutch and Cook, testified that, while he was in jail with Cook, Cook told him that it was Foutch who came out of Young's house carrying the gun and Foutch who subsequently put the gun to Cook's head.

The defendant also testified. He stated that he met Foutch for the first time on the evening of May 11 when Foutch and others gave him a ride to the Depot Lounge. According to the defendant, Foutch returned to the Depot a short time later and asked him whether he wanted to "go cruising" to Young's house to pick up some money that Young owed Foutch. After the Pattens let them out of the car, the defendant, Foutch, and Cook walked up the road to Young's house. Young admitted them to the house, and Foutch and the defendant then conversed with him. After Cook and the defendant attempted to make phone calls, Young suggested they try getting a ride at the Banks Bowl. Cook walked out of the house. After Young refused Foutch's request to give them a ride, Foutch kicked Young in the head. When the defendant bent down to help Young, Young grabbed him and started wrestling with him. Foutch kicked Young and hit him over the head with an ashtray. Foutch took a gun off the mantel and shot Young twice. According to the defendant, it was Foutch who put the gun to Cook's

head after they left the house and Foutch who suggested returning to wipe off the fingerprints.

The defendant further related that, on their return to the house, Cook and Foutch argued over a wallet, and Cook announced the safe was empty. Foutch made the defendant drive Young's truck even though the defendant had never had a driver's license. When Foutch learned the defendant's jacket had been left in the house, he demanded they go back a second time. The three finally drove to Centralia, and the truck was left at Shorty's Disco. The defendant had never before met Cook or Foutch and had no idea a burglary or robbery was planned. He admitted to four prior burglary convictions, three theft convictions, and a conviction for trafficking in contraband in a penal institution.

On cross-examination, the defendant was questioned about several aspects of the statement he gave to the police after his arrest, which was recounted by a police officer at trial. When asked whether he initially denied any knowledge of what had happened, the defendant first responded that he had not. He then stated that, since he did not know Young, he did not know who the police were referring to in their interrogation. The defendant denied that he told the police that he was not involved in the struggle with Young. He could not recall whether he told them that he was at the Depot Lounge until 2 a.m. or that he was drunk.

The defendant raises numerous issues concerning both his conviction and the sentence imposed, but we need discuss only one of these. The defendant contends that he deserves a new trial because Cook's testimony about Foutch's statements made the day after the killing, including Foutch's declaration that the defendant, not Foutch, fired the fatal shot, was impermissible hearsay which should have been excluded.

The State does not dispute that Foutch's declarations, recited by Cook at trial, constituted hearsay. Its position, however, is that the statements fall within the co-conspirator exception to the hearsay rule. That exception permits declarations made "in furtherance of and during the pendency of the conspiracy" to be admitted not only against the declarant, but also his co-conspirators upon an independent, *prima facie* showing of a conspiracy. (*People v. Goodman* (1980), 81 Ill. 2d 278, 283.) While Foutch's statements to Cook clearly occurred after the real object of the conspiracy—the robbery and killing of Young—was completed, the State sought to admit them as furthering a subordinate conspiracy or an extension of the conspiracy to conceal the offenses. Assuming that the co-conspirator exception does include so-called "concealment phase" statements, Foutch's hearsay declarations implicating the defendant would not fall within the exception since they were not made in furtherance of any effort at concealment.

The State's theory is that Foutch described the events surrounding the shooting—including the fact that the defendant fired the fatal shot—in order to assure Cook's silence by impressing him with the seriousness of the offense, thus furthering the cover-up of the crime. The State conjectures that although Cook knew the victim was killed in the course of the robbery, he may have believed that the killing was done by Foutch and the defendant in self-defense or in response to provocation by the victim. This view of the conversation to which Cook was allowed to testify is wholly without support in the record. Cook's testimony revealed no doubts on his part as to the fact that a murder had occurred, and there is nothing to suggest that Foutch believed Cook labored under any misapprehension as to the culpable nature of the killing. To the contrary, Cook testified that when they initially fled the scene of the killing and the defendant suggested they

return to remove fingerprints and get the money, Cook replied that he didn't want to "go to jail for murder for something [he] didn't do." Given this comment, as well as the other circumstances surrounding the offense—the late night trip to Young's home, Cook's participation in the burglary plot, the action by either the defendant or Foutch in threatening Cook with a gun when he balked at going back for the money, and the attempts by the three to cover their tracks—it is fanciful to suppose that Cook harbored any benign view of the killing or was so naive that he needed to be impressed with its seriousness.

In context, Foutch's obvious motive in telling Cook that the defendant fired the second shot was not to conceal the crime but to ensure that primary blame for the crime fell on the defendant. Foutch was responding to Cook's threat to tell all to the police—which is precisely what Cook did upon his arrest. In that eventuality, it was in Foutch's interest to give Cook a story comparatively favorable to Foutch. While an attorney caught in similar circumstances might realize that Foutch, on his own story, could be guilty of murder by accountability, there is no reason to believe that Foutch possessed such a high degree of legal sophistication. As a matter of common sense, Foutch could certainly have believed that by implicating the defendant as the one who fired the second shot point-blank at Young's head, and emphasizing that Young was still alive after the first shot, the defendant and not Foutch would bear the full brunt of the criminal law.

The only thing that Foutch told Cook which had to do with concealing the crime was his advice not to talk to the police. Foutch's statements describing the events inside Young's house were not calculated to conceal the offense and had no relevance to such a purpose. No matter how broadly we read the co-conspirator exception to the hearsay rule, what Foutch told Cook does not fall within that exception. The trial judge erred in permitting

Cook's testimony repeating what Foutch told him about the details of the killing.

The State maintains that, even if admission of this hearsay was error, the error was harmless beyond a reasonable doubt. The State advances two arguments in support of the harmless-error theory. First, the State contends that the hearsay was not the most damaging evidence that the defendant fired the fatal shot. In addition to the hearsay declaration, Cook testified that he heard two gunshots and thereafter the defendant ran out of the house with a gun. This testimony, however, was disputed by James Miller, who had been a cellmate of Cook's after Cook's arrest. According to Miller, Cook told him that Foutch, not the defendant, was the one who ran out of Young's house with the gun. Cook, who had known Foutch for years but only met the defendant on the night of the crime, may have had his own motive for implicating the defendant. Foutch's hearsay declaration also served to buttress the effect of Cook's testimony that the defendant had the gun. It cannot be said that absent Foutch's hearsay statement the jury would have been persuaded that the defendant in fact participated in the shooting.

The State responds that the error was nevertheless harmless because the jury could have returned the same verdicts, convicting the defendant of both knowing murder and felony murder, without evidence that the defendant fired any shots at all. As the State correctly notes, the jury could have believed that Foutch killed the victim and yet concluded there was sufficient evidence to find the defendant guilty as an accomplice on both counts (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(a), 5—2(c); *People v. Pierce* (1944), 387 Ill. 608). In effect, the State argues that it need not rely on the evidence that the defendant pulled the trigger to sustain the convictions.

This argument is based on a misunderstanding of the harmless-error rule. The question is not what the State relies upon on appeal, but what the jury might have relied upon in reaching its verdict. The single most damning piece of evidence against the defendant was Cook's testimony that Foutch told him the defendant went up to the already injured Young and shot him in the head. This evidence not only directly implicated the defendant as the killer, but may have affected the jury's assessment of the defendant's credibility in testifying that he was unaware Foutch and Cook were planning to commit a burglary and that he was attempting to assist Young, not injure him. The State is clearly correct that the jury *could have* rejected the defendant's version, as well as the testimony of other defense witnesses, and convicted the defendant on both counts even absent the hearsay evidence. We cannot say beyond a reasonable doubt, however, that the jury *would have* done so or that "the erroneous admission of the hearsay declaration may not have been the weight that tipped the scales against" the defendant (*Krulewitch v. United States* (1949), 336 U.S. 440, 445, 93 L. Ed. 790, 795, 69 S. Ct. 716, 719).

Although our review of the record satisfies us that there was sufficient evidence presented to convict the defendant, the error, for the reasons stated above, cannot be considered harmless. The convictions must therefore be reversed and the cause remanded to the circuit court of Marion County for a new trial.

*Reversed and remanded.*

CHIEF JUSTICE CLARK, specially concurring:

The court reverses the defendant's murder convictions on the ground that Cook's testimony, recounting Foutch's confession to having acted together with the defendant in killing Young, was improperly admitted under the co-conspirator exception to the hearsay rule. Be-

cause its novel decision finds no support in case law and rests wholly upon a foundation riddled with conjecture, I do not join in the court's opinion. I join in its judgment, however, because I believe that the trial judge abused his discretion in refusing to excuse a juror notwithstanding substantial evidence that the juror was a friend of Young's and had been less than candid on *voir dire* in revealing the true nature of their relationship.

I

As the court acknowledges, the co-conspirator exception to the hearsay rule provides that a declaration of a conspirator is admissible against any other co-conspirator if made during the course and in furtherance of the conspiracy, the existence of which is shown by evidence independent of the proferred declaration. (*People v. Goodman* (1980), 81 Ill. 2d 278, 283.) Since criminal conspiracies are, by their very nature, secretive endeavors, the great utility of the co-conspirator exception is that it aids the prosecution of cases in which proof of the crime "would otherwise be very difficult and the evidence largely circumstantial." (*United States v. Gil* (7th Cir. 1979), 604 F.2d 546, 549.) While the pendency and furtherance requirements would seem to suggest the exclusion of declarations made after the principal objective of the conspiracy is achieved, Illinois courts have widely admitted under the exception declarations made in an effort to conceal the underlying offense. (See, *e.g., People v. Columbo* (1983), 118 Ill. App. 3d 882, 948-49; *People v. McInnis* (1980), 88 Ill. App. 3d 555, 565-66.) The rationale for the admission of co-conspirator declarations made during the "concealment phase" of a crime is that acts of concealment further the conspiracy by allowing the conspirators to thwart justice and escape punishment. *People v. Meagher* (1979), 70 Ill. App. 3d 597, 602.

The court holds that Cook's testimony, relating Foutch's account of the circumstances leading up to Young's murder, was inadmissible under the co-conspirator exception because Foutch's statements "were not made in furtherance of any effort at concealment." (117 Ill. 2d at 393.) In my view, the court's conclusion is premised on an analysis pregnant with speculation and wanting of sound reasoning.

The morning after the murder, Cook, who did not see the killing because he was outside Young's home at the time, told Foutch that he would talk to the police if questioned. In what can only be reasonably characterized as an effort to secure Cook's silence, and thus conceal the robbery and murder, Foutch admonished Cook not to talk to the police or be nervous. He then related to Cook how, among other things, he hit Young over the head with an ashtray, shot him once, and the defendant shot him again. He told Cook that Young was still alive after the first shot.

The court, unencumbered by the record evidence, surmises that "Foutch's obvious motive in telling Cook that the defendant fired the second shot was not to conceal the crime but to ensure that primary blame for the crime fell on the defendant."(117 Ill. 2d at 394.) I cannot agree. If in fact Foutch's "obvious motive" was to shift the blame to the defendant, it is perfectly clear that he could have easily and effectively accomplished that end by telling Cook a story very different from his self-incriminating account of the killing. Cook, who did not see the actual murder, stated that he saw the defendant covered with blood and carrying a gun as he fled the scene. If Foutch truly desired to shift the blame to the defendant, he would have told Cook that the defendant fired *both* shots as he stood by unable to help Young. Foutch, however, did nothing of the kind. Instead, he impressed upon Cook the necessity for his silence, the gravity of

the crimes if they were apprehended, and, in so doing, made a direct admission against penal interest in declaring his active participation in the killing. Given the devastatingly self-incriminating nature of Foutch's precustodial statements, I frankly cannot understand why the court believes they were an "obvious" effort to exonerate him or shift the blame.

Nor can I endorse the court's further conjecture: "As a matter of common sense, Foutch *could certainly have believed* that by implicating the defendant as the one who fired the second shot point-blank at Young's head, and emphasizing that Young was still alive after the first shot, the defendant and not Foutch would bear the full brunt of the criminal law." (Emphasis added.) (117 Ill. 2d at 394.) This is rank speculation and, as such, wholly unpersuasive. Certainly, it is no victory for common sense to suppose that Foutch would confess to firing the first shot and identify the defendant as firing the second all the while under a fantasy belief that, on his precustodial account of the murder, the defendant alone "would bear the full brunt of the criminal law." To suppose so, without any supporting facts, is to stretch the imagination, part company with common sense, and stand on its head the well-established doctrine of Anglo-American law that one is presumed to know the law. (*Parker v. Levy* (1974), 417 U.S. 733, 751, 41 L. Ed. 2d 439, 455, 94 S. Ct. 2547, 2559; *People v. Cohn* (1934), 358 Ill. 326, 331.) Thus, "common sense" would dictate that Foutch, had he wanted to shift the blame, would have simply said that the defendant fired both shots.

Because the court's freewheeling speculation fails to afford any principled basis for concluding that Foutch did not intend by his statements to secure Cook's silence, and thereby conceal his complicity in the robbery and murder, I would hold that Cook's testimony was admissible under the co-conspirator exception. Moreover,

as a matter of judicial economy, I can see no reason for the court to even reach the co-conspirator issue. More fundamental to this appeal, the defendant argues, and the record reveals, that the trial judge abused his discretion in refusing to excuse a juror in light of considerable evidence, adduced before any proceedings other than jury selection, that the juror had been less than truthful on *voir dire* in disclosing the nature and extent of his friendship with the murder victim, Young.

## II

During *voir dire*, when asked by the trial judge whether he knew Young, venireman Robert Simpson, Jr., testified that he "kind of knew him whenever he was married." Simpson explained that Young had lived across from a park and that occasionally, when he was there on his motorcycle, Young "might come over and talk to us a while." Any conversation with Young would not have lasted "over 15 minutes, if that." Simpson further testified that neither he nor Young had ever visited the other in their respective homes. He stated that they had never spent a lengthy period of time together at a social gathering. Simpson stated that his acquaintance with the murder victim would not affect his ability to be impartial.

Defense counsel was permitted to question Mr. Simpson. Asked whether he had ever been to the Youngs' home, Simpson replied that he "had never been in the home" though he had ridden by it. Simpson explained that when Young was outside working on his truck, he, Simpson, would sometimes "say 'hi' to them, you know, like when you pass by."

The defendant moved to excuse Simpson for cause. The trial judge refused, stating that it was "not uncommon in a small rural community for people to know one another[, t]o say hello, [and] to greet people at different functions." The trial judge based his decision on his un-

derstanding from Simpson's answers that he and Young had "never socialized in their house[s]" and that "the meetings were just haphazard, by chance meetings and just more or less exchanging of pleasantries." The defense did not use any of its remaining peremptory challenges against Mr. Simpson, and he was sworn as a juror.

The following day, the court was informed that Steven Donoho, an investigator for the defense, had inadvertently spoken to Simpson in attempting to contact his daughter Annette, a potential witness. Donoho testified that he abandoned his inquiry with Mr. Simpson upon hearing from his wife that he had been sworn as a juror. Mrs. Simpson then took the investigator to see Annette, who was at another house. As he recalled the interview, Annette said, in referring to Young's murder: "[W]e were shocked by this. We knew Young. And we liked him." Mrs. Simpson agreed, adding: "We knew him. He'd been over to our house."

The court next recalled juror Simpson. After questioning him concerning defense investigator Donoho's visit, the judge returned to the subject of Simpson's relationship with the victim. Simpson repeated that while riding his motorcycle he would occasionally "stop and say 'hi' to him," talking no longer than 15 minutes. He had come to know Young through Young's wife, Mary. Simpson denied being a close friend to the Youngs, though he conceded that his wife had visited Mary Young "quite a bit" before the Youngs were married. Simpson also revealed that his wife had told him the previous night that Mr. Young had once come to their house to inquire about a car for sale.

The defense renewed its challenge for cause. The judge again refused to excuse Simpson, stating in effect that the revelation that Young had once gone to Simpson's home did not alter his finding that Simpson could be a conscientious and impartial juror.

Following the impanelment of the jury, but before the commencement of any other proceedings, defense counsel learned that Mary Young, the victim's ex-wife, disputed juror Simpson's account of his relationship with Young. Mary Young testified that she had been married to the victim for three years and, except for an eight-month period, had lived with him for at least four years following their divorce. During this period they were neighbors of Mr. Simpson. Mrs. Young further testified that she was "dumbfounded by the fact that Mr. Simpson would not say that he was a friend" and that, while they were neighbors, Simpson and Young were in fact "good friends." She testified that between 1972 and 1979, Simpson visited "every couple of weeks," usually outside in their yard. Mrs. Young also said that Simpson had visited in their home a few times, but could later recall only one specific instance. When together, Simpson and Young discussed trading and repairing cars, mechanical things, and Young's mail trucks. Sometimes they talked for two or three hours, and Simpson would "stay until we almost had to ask him to go home because it was bedtime."

Mrs. Young stated that she and Simpson were friends, her children and his were friends, and the youngest Simpson child, in particular, would spend a great deal of time at her house. When Simpson's wife went into labor with their youngest child, Simpson left his other two children in the Youngs' care for the night. Mr. Simpson's visits were often to pick up his youngest child, and he would then stay and visit. At times he would come to their home solely to visit Young.

On cross-examination, Mrs. Young was asked to specify the total number of times Simpson had visited. Although she first estimated 25 to 30 times, she immediately said that it would have been more than that. She calculated that Simpson had visited some 150 times over seven years, a number based on her testimony that the

men conversed every couple of weeks. Mrs. Young agreed with Simpson's statement that he and Young had never gone out together socially, noting that Young had worked unusual hours and that he had never taken her out to a restaurant either.

On re-cross-examination, Mrs. Young admitted that she hated her ex-husband and was relieved that he was dead. Mrs. Young denied ever saying that she was glad that he had been killed. She stated that she did not see how Simpson could serve as an unbiased juror. The State then called a police officer who recalled Mrs. Young stating that she was glad her ex-husband was dead and happy that he had been murdered, but admitted that he had taken no notes of the conversation.

Once again, the defense asked that Mr. Simpson be removed from the jury. The judge refused, noting that he had previously ruled that there would be no further questioning of Mr. Simpson. He found that even if everything that Mrs. Young said was true, it would not "really contradict anything that Mr. Simpson said." Other than the fact that Mrs. Young recalled a single, specific visit by Simpson, the judge found no substantial discrepancy between their testimony. The judge stated that the conversation in the house, like those in the yard, did not involve "anything personal" and said that it could not be characterized as a "social event." The judge found, with respect to that visit, that it was a question of credibility, and concluded that Simpson's testimony was credible. He expressed "some concern about total reliance on Mrs. Young's statement" because the fact that she was glad or relieved that her ex-husband had been killed "tends to show a bias in this proceeding. She may have motives of her own for testifying here." Conceding that it would perhaps be expedient to excuse Mr. Simpson, the judge stated it was within his discretion not to do so.

In my view, Mrs. Young's testimony yielded substantial evidence that Simpson and the victim were friends and consequently that Simpson had not testified truthfully during *voir dire*. The trial judge's finding of no substantial discrepancy between the testimony of Simpson and that of Mrs. Young was erroneous and his refusal to excuse Simpson an abuse of his discretion.

Contrary to the ruling of the trial judge, the disparity between the testimony of Simpson and Mrs. Young was striking and hardly limited to the specific visit by Simpson which Mrs. Young related to the court. Simpson portrayed his relationship with the victim as largely a nodding acquaintance, several times likening their encounters to little more than a passing "hi" so that he only "kind of knew" Young. After Simpson's initial testimony on *voir dire*, the judge, too, found that the encounters were "more or less an exchange of pleasantries." In stark contrast, Mrs. Young testified that her ex-husband and Simpson were good friends, spending a good deal of time together, albeit not in a social context. She was also a friend of Simpson's and frequently entrusted with the care of his children. Further, the nature of the friendship between the two families was corroborated by the uncontroverted testimony of the defense investigator, who recounted that Simpson's daughter, Annette, told him that they knew and liked Young and were shocked by his murder; Mrs. Simpson, according to the investigator, added that Young had been over to their house.

Adding to the sharply contrasting pictures of the relationship, Simpson stated that any conversations lasted no longer than 15 minutes at the most, whereas Mrs. Young stated that they often lasted two or three hours. While Simpson said that the two met only "once in a while," Mrs. Young testified that Simpson visited regularly, every couple of weeks. Mrs. Young's testimony also challenged Simpson's claim that they spoke at the park or when he

rode past the Young residence. Mrs. Young said that her ex-husband and Young usually spoke in the backyard, and less frequently in the house, recalling one specific conversation. Simpson never mentioned that the two families were once neighbors, that he would pick up any of his children from the Young home, or that he had left his children there when his youngest was born.

Nowhere in the record did the trial judge find that Mary Young was not a credible witness. Rather, the judge found that, assuming her testimony was true, nothing prevented Simpson from serving as a juror. Although the judge indicated "some concern about total reliance on Mrs. Young's statement," he offered no explanation as to how her ill-feelings toward her ex-husband or relief at his death could motivate her to lie about Simpson. Even if it is assumed that Mrs. Young was interested in seeing the killer go free, that goal would not have been advanced by false testimony that Simpson and Young were good friends. For if Simpson and Young were only acquaintances, and Mrs. Young had fabricated her account of their relationship, then Simpson's removal from the jury would not have increased the defendant's prospects for an acquittal. Moreover, Mrs. Young would be perjuring herself to remove a juror whom she knew to be impartial. Plainly, any interest in obtaining the defendant's acquittal would be served only if Mrs. Young's testimony that Simpson and her ex-husband were friends was the truth. Thus, it cannot be seriously maintained that Mrs. Young had a reason to lie in disclosing their relationship.

Nor can there be any serious contention that a juror who is a friend of the murder victim can impartially decide the fate of the accused killer. (*State v. Deatore* (1976), 70 N.J. 100, 358 A.2d 163 (close relationship between prospective juror and victim); see also *United States v. Allsup* (9th Cir. 1977), 566 F.2d 68, 71 (two prospective jurors worked at another branch of the bank

robbed by the defendant); *State v. Brown* (La. 1986), 496
So. 2d 261 (one prospective juror knew the victim's par-
ents through his son's little league activities and had once
hosted a party for the baseball team, which the victim's
parents attended; the son of another prospective juror
had dated the victim once or twice, the victim had visited
the prospective juror's home a few times, and the pro-
spective juror knew the victim's parents); *State v. Holli-
man* (Mo. App. 1975), 529 S.W.2d 932 (prospective juror
was a friend of the deceased police officer's father, knew
the victim, and was himself the father of a police officer).)
"The potential for substantial emotional involvement" for
a juror in such a situation is painfully evident (*United
States v. Allsup* (9th Cir. 1977), 566 F.2d 68, 71), and
gives rise to a presumption of partiality. Bare protesta-
tions of impartiality do not rebut the presumption because
such assertions run "counter to human nature." *State v.
Deatore* (1976), 70 N.J. 100, 106, 358 A.2d 163, 166; *cf.
Murphy v. Florida* (1975), 421 U.S. 794, 800, 44 L. Ed.
2d 589, 595, 95 S. Ct. 2031, 2036 ("juror's assurances
that he is equal to [the] task cannot be dispositive of the
accused's rights").

Here, the defendant produced substantial evidence
that Simpson had a disqualifying relationship with the
victim. The testimony of Mrs. Young was corroborated
by the comments of the juror's own family members
which were related by the investigator and thus went far
beyond establishing "mere suspicion of bias or preju-
dice." *People v. Porter* (1986), 111 Ill. 2d 386, 405.

Although questions of witness credibility generally lie
in the sound discretion of the trial judge (*People v. Cole*
(1973), 54 Ill. 2d 401, 414), a reviewing court will not
"rubber stamp" an erroneous judgment that results
from an abuse of that discretion. The judge here based
his refusal to excuse Mr. Simpson on a demonstrably in-
accurate view of the record and far too narrow a view of

the type of relationship that disqualifies a juror. In addition, the judge erred in relying on a wholly unsupported belief that Mrs. Young possibly had an ulterior motive in testifying. Finally, the conclusion that the trial judge abused his discretion in refusing to excuse Mr. Simpson is further strengthened by the fact that the inconvenience of his disqualification would have been negligible; at that point the proceedings had not advanced beyond selection of the jury, and alternate sworn jurors were available.

"[T]he right to [a] jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." (*Irvin v. Dowd* (1961), 366 U.S. 717, 722, 6 L. Ed. 2d 751, 755, 81 S. Ct. 1639, 1642.) Thus, it is incumbent upon the trial judge to ensure that the accused receives a fair trial by "a jury capable and willing to decide the case solely on the evidence before it." (*Smith v. Phillips* (1982), 455 U.S. 209, 217, 71 L. Ed. 2d 78, 86, 102 S. Ct. 940, 946.) The determination of whether a prospective juror is impartial, however, is "difficult, partly because the juror may have an interest in concealing his own bias and partly because the juror may be unaware of it." (455 U.S. 209, 221-22, 71 L. Ed. 2d 78, 89, 102 S. Ct. 940, 948 (O'Connor, J., concurring).) While it is perhaps possible that Simpson was unaffected by his relationship with the victim, I would hold that the trial judge abused his discretion in failing to excuse him for cause.

For these reasons, I concur in the judgment of the court.

JUSTICE SIMON joins in Part II of CHIEF JUSTICE CLARK's specially concurring opinion.