# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*People v. Denson*, **2013 IL App (2d) 110652**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DARREN DENSON, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-11-0652 |
| Filed | May 23, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for first-degree murder, armed robbery and home invasion were upheld over his contention that the trial court improperly admitted the testimony of three witnesses, since defendant's objections, including his claims that some of the testimony was not admissible under the coconspirator exception to the hearsay rule, were either forfeited or the testimony was harmless and did not amount to reversible error. |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 05-CF-1324; the Hon. Timothy Q. Sheldon, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on Appeal | Thomas A. Lilien and Christopher McCoy, both of State Appellate Defender's Office, of Elgin, for appellant.

Joseph H. McMahon, State's Attorney, of St. Charles (Lawrence M. Bauer and Scott Jacobson, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel | JUSTICE McLAREN delivered the judgment of the court, with opinion.
Justices Zenoff and Schostok concurred in the judgment and opinion.

## OPINION

¶ 1      After a jury trial, defendant, Darren Denson, was convicted of one count of first-degree murder (720 ILCS 5/9-1(a)(2) (West 2002)), one count of armed robbery (720 ILCS 5/18-2(a)(1) (West 2002)), and one count of home invasion (720 ILCS 5/12-11(a)(1) (West 2002)). The trial court sentenced defendant to a term of life imprisonment on the murder charge, to be served consecutively to 30-year sentences on the other charges. Defendant now seeks a new trial. We affirm.

¶ 2                          I. BACKGROUND

¶ 3      Defendant was charged in the February 2003 murder and robbery of Kyle Juggins. Three codefendants–Taurean Giles, Getino Robinson, and Kineta Bell–were also charged with murder and other offenses. The trial court granted the State's motion *in limine* to admit testimony regarding various statements of these codefendants, pursuant to the coconspirator exception to the hearsay rule. See Ill. R. Evid. 801(d)(2)(E) (eff. Jan. 1, 2011); *People v. Thomas*, 178 Ill. 2d 215, 237-38 (1997). Defendant was initially tried before a jury in November 2010. The trial court declared a mistrial because the jury was "hopelessly deadlocked." Defendant was again tried before a jury in April 2011, resulting in the convictions above. The trial court denied defendant's motion for a new trial and imposed defendant's terms of imprisonment. This timely appeal followed.

¶ 4                          II. ANALYSIS

¶ 5      Defendant first contends that the trial court erred in granting the State's motion to allow testimony under the coconspirator exception to the hearsay rule. Defendant cites to case law that contains holdings that define coconspirator statements as an exception to the traditional definition of hearsay, which has been radically modified by the Illinois Rules of Evidence (Rules). Rather than continue to refer to such statements as an exception to the hearsay rule,

and thus substantively admissible, the Rules have defined such statements as not hearsay. A statement is not hearsay if it is offered against a party and was made by the party's coconspirator during the course and in furtherance of the conspiracy. Ill. R. Evid. 801(d)(2)(E) (eff. Jan. 1, 2011). In analyzing the sundry cases regarding the admissibility of the statements here, we will continue to reference the terminology used in the cases. However, consistent with the Rules, we ultimately conclude that some of the statements were admissible because they were not hearsay under the Rules.

¶ 6    Defendant argues that the trial court erred in admitting two segments of testimony: (1) that of Melanie Banner (Bell's sister) regarding statements that Bell made to her on the night of the murder; and (2) Bell's testimony regarding statements made to her by Giles and Robinson as she drove them to Banner's apartment after the murder.

¶ 7    The State argues that defendant has forfeited this issue on appeal because he failed to object to this testimony at trial. While admitting that he did not object at trial, defendant counters that he properly preserved the issue because he filed a response in opposition to the State's motion, argued against the motion, and contended in his posttrial motion that the trial court erred in granting the motion. Defendant cites to *People v. Hudson*, 157 Ill. 2d 401, 434-35 (1993), and *People v. Mason*, 274 Ill. App. 3d 715, 721-22 (1995), to support his argument that a trial objection is unnecessary to preserve an issue when it has been raised in a response to a motion *in limine*. However, in both *Hudson* and *Mason*, the defendants did not respond in opposition to a motion *in limine* filed by the State; the defendants were the parties who *filed* the motions *in limine*. See *Hudson*, 157 Ill. 2d at 434 ("we find that defendant preserved this issue for review by *raising it in a motion in limine* and in his post-trial motions" (emphasis added)); *Mason*, 274 Ill. App. 3d at 721 ("defendant preserved this issue when *he raised it* both in *his* motion *in limine* and in his post-trial motion" (emphases added)).

¶ 8    Defendant seeks support in *People v. Maldonado*, 398 Ill. App. 3d 401 (2010), in which the First District, Fourth Division, citing to *Hudson* and *Mason*, held that the defendant preserved an issue for appeal "when he raised it in both his *reply* to the State's motion *in limine* and in his posttrial motion." (Emphasis added.) *Id.* at 415. However, neither *Hudson* nor *Mason* involved or addressed the preservation of an issue for appeal by raising an objection to a motion *in limine*. In a single paragraph, *Maldonado* morphs the law from "the supreme court holding that raising an issue in a motion *in limine* is sufficient to preserve an issue so long as it is also raised in the posttrial motion" to "because defendant did object to the introduction of this evidence both in his reply to the State's motion *in limine* and in his posttrial motion, we conclude that this issue was sufficiently preserved." *Id.* at 416. This *non sequitur* is a patent distortion of a supreme court holding, made with no analysis or purported justification for the expansion of the supreme court's holding. We are unaware of any case prior to *Maldonado* that holds that raising an issue in a *reply* to the State's motion *in limine*, rather than in the defendant's motion, is sufficient for preservation of the issue. To the extent that *Maldonado* so holds, we disavow that holding.

¶ 9    We further note that the denial of a motion *in limine* does not in itself preserve an objection to disputed evidence that is later introduced at trial; a contemporaneous objection to the evidence at the time that it is offered is required to preserve the issue for review.

-3-

*Simmons v. Garces*, 198 Ill. 2d 541, 569 (2002). A trial court's ruling on a motion *in limine* is an interlocutory order that is subject to review by the trial court any time prior to or during trial. *People v. Hansen*, 327 Ill. App. 3d 1012, 1027 (2002). When a trial court addresses a pretrial motion *in limine* on the merits, its ruling is always subject to reconsideration during trial. *People v. Drum*, 321 Ill. App. 3d 1005, 1008 (2001). Events at trial may still affect the trial court's understanding of the probative value of the evidence, the risk of unfair prejudice to the party opposing the evidence, or the trustworthiness of the evidence. *Id.* at 1008-09. A defendant cannot rely on the trial court's denial of his own motion *in limine* to preserve an issue for appeal. Even less so can a defendant rely only on his pretrial *opposition* to *the State's* motion *in limine* to admit evidence as a means to preserve the issue for appeal.

¶ 10    In his reply brief, defendant does not argue that, if this issue was not properly preserved, this court should review it for plain error or ineffective assistance of counsel; instead, defendant insists that the issue of the coconspirator statements "was preserved and, as such, is reviewable under the harmless-error framework" set out in *People v. Thurow*, 203 Ill. 2d 352, 363 (2003). However, we have found that the issue was not properly preserved and is forfeited. The harmless-error analysis applies only where the defendant has properly preserved the issue by timely objection. *Id.* Where an issue is forfeited, we may review it only for plain error or ineffective assistance. See *People v. Sanders*, 2012 IL App (1st) 102040, ¶ 24. As defendant does not seek the only review that we can grant in light of his forfeiture, we can grant no review or relief on this issue.

¶ 11    Even if defendant had not forfeited the issue, we would find no reversible error here. The coconspirator exception to the hearsay rule provides that any declaration by one coconspirator is admissible against all coconspirators where the declaration was made during the pendency of and in furtherance of the conspiracy. *People v. Kliner*, 185 Ill. 2d 81, 141 (1998).

¶ 12    We will first address defendant's claim regarding Bell's testimony. Bell testified that she was at Banner's house on the night of February 10, 2003, when she received a phone call from Giles, her boyfriend, in which he asked her to call a man named Tawyka Bonds (Bell's former boyfriend) because Giles "wanted to rob him." Bell called Bonds twice but got no answer. Giles, Robinson, and defendant then drove in defendant's car to Banner's house at approximately 11:30 p.m. Bell, but not Banner, met with the three men in Banner's bedroom. She saw that defendant had a knife and Robinson had a gun. The men stated that they wanted to rob Bonds or Juggins (who was nicknamed Cal), and they wanted Bell to show them where both men lived. She called Bonds again but got no response. Bell then drove her car, followed by defendant, Robinson, and Giles in defendant's car, to the home of the mother of Bonds' child; Giles called Bell and told her that, since it looked like no one was home, she should lead them to Juggins' house. She led defendant's car to Juggins' apartment complex and told Giles by cell phone which apartment was Juggins'. She then returned to Banner's house.

¶ 13    Bell then received a call from Giles asking her to pick up Robinson and him from an apartment complex in Elgin because defendant "had to get on the highway." At the complex, Giles and Robinson got into Bell's car, and they drove toward Bell's apartment; they saw police cars turning into her complex, so Bell was told to drive to Banner's house. Giles then

told Bell that Juggins was dead. At trial, Bell described what happened next:

> "Q. [Assistant State's Attorney:] Did Taurean Giles also describe what had happened once you left [Juggins'] address?
>
> A. [Bell:] He did.
>
> Q. What did he tell you had happened?
>
> A. He told me that they had broke in, um, the laundry room window and then had kicked Kyle's door in. Um, they were looking for a safe. In the process Kyle had shot at him. Getino shot Kyle, and then the Jamaican [identified as defendant] got on top of Kyle and stabbed him.
>
> Q. Does Getino Robinson tell you anything about what happened in that apartment?
>
> A. Um, yes. He said that he shot Kyle after he shot at Taurean.
>
> Q. Did he also tell you what the Defendant did in that apartment?
>
> A. He did.
>
> Q. What did Getino Robinson say the Defendant did in that apartment?
>
> A. He said the same thing that Taurean said, that he got on top of Kyle and stabbed him.
>
>                      \* \* \*
>
> Q. When you just told us, told the ladies and gentlemen of the jury that Getino said he got on top of him and stabbed Kyle, or Cal, who did he specifically say got on top of Kyle Juggins and stabbed him?
>
> A. Jamaican."

¶ 14 Bell also testified that she, Giles, and Robinson then went into Banner's bedroom, where she saw three guns and the knife that defendant had previously carried; the handle of the knife had blood on it. They hid the weapons under Banner's couch and drove Robinson to his home in Rockford. The following day, Giles took the guns to his brother's house.

¶ 15 Defendant now argues that Bell's testimony regarding the statements made by Giles and Robinson in her car were inadmissible under the coconspirator exception because the statements were not made in furtherance of the conspiracy. Statements made in furtherance of a conspiracy include those that have the effect of "advising, encouraging, aiding or abetting its perpetration." *Id.* Statements made after the crime in an effort to conceal the crime or escape punishment further the objective of a conspiracy. *Id.* However, a mere narrative of past occurrences that does not further any objective of the conspiracy is not subject to the coconspirator exception. *Id.*

¶ 16 Defendant argues that Giles' and Robinson's statements in the car were merely restatements of what had occurred and were not made to conceal the crime. We disagree. The statements were not idle recaps of the evening's events. The criminal enterprise in which defendant, Bell, Giles, and Robinson had conspired had led not to mere robbery but to murder. As the enterprise had changed, so, too, did the necessary actions for concealment of their crime. The murder had just occurred; Giles and Robinson still had in their possession the weapons used to kill Juggins, and they had just changed their destination because of the

appearance of the police near Bell's apartment. Explaining what happened and what led to their current predicament was not mere narrative; it furthered the efforts to conceal their actions.

¶ 17    Defendant likens this case to *People v. Parmly*, 117 Ill. 2d 386 (1987), which involved a planned burglary that led to murder. Our supreme court found that the coconspirator exception did not apply to a statement that the defendant fired the second, fatal shot, made the day after the murder, by a coconspirator (Foutch) who witnessed the murder to a coconspirator (Cook) who was outside the house when the victim was killed. *Id.* at 394. The court found as a "matter of common sense" that the statement was made to implicate the defendant so that he "would bear the full brunt of the criminal law." *Id.* We find *Parmly* distinguishable. First, we note that both Giles and Robinson told Bell that Robinson shot Juggins and that defendant stabbed him. There is no indication that either knew whether the gunshot or the stab wound was the cause of death.[1] This was no attempt to deflect blame for Juggins' death. Further, in *Parmly*, Cook already knew at the time of the murder that the victim had been killed; he heard the two gunshots and was told by the coconspirators as they ran from the house; he even returned to the murder scene with the others to clean up evidence and get money. *Id.* at 389-90. A recounting the following day describing who fired which shot did not further the conspiracy. As we stated above, Bell did not know what had occurred in Juggins' apartment. She had been asked to pick up Giles and Robinson because defendant "had to get on the highway." She did not even know if the robbery was attempted, let alone that the home invasion had led to murder. We would find no error in the admission of this testimony, let alone prejudicial error. As we have found that Bell's testimony was properly admitted as coconspirator statements, which by definition were not hearsay (see Ill. R. Evid. 801(d)(2)(E) (eff. Jan. 1, 2011); *People v. Leach*, 2012 IL 111534, ¶ 80 n.2), we need not address defendant's summary argument regarding *Crawford v. Washington*, 541 U.S. 36 (2004). See *Leach*, 2012 IL 111534, ¶ 80 n.2.

¶ 18    Defendant's next claimed error involves the testimony of Banner, who testified about her conversation with Bell before defendant, Giles, and Robinson came to her house on the night of Juggins' murder:

"Q. [Assistant State's Attorney:] Before other people got over to your apartment, but after you overheard part of what your sister, Kineta Bell, was saying on the phone, did Kineta Bell, your sister, tell you anything about those phone calls?

A. [Banner:] Yes.

Q. And what did she say?

A. Basically that she was trying to contact someone which I knew named Tawyka to find out where he lived because someone wanted to rob him, and she was glad that she was unable to find Tek because she didn't want to set him up to be robbed.

---

[1]At trial, Dr. Larry Blum, a forensic pathologist who had reviewed the autopsy protocol, testified that Juggins suffered two fatal injuries–a stab wound to the right upper chest and a gunshot wound to the back of the head. While the primary cause of death was blood loss from the stab wound, the gunshot was a "contributory cause of death."

Q. So they wanted to rob–somebody wanted to rob Tawyka. Did she tell you who that was?

A. Yes.

Q. Who was that?

A. Taurean, Getino, and Jamaica.

Q. Did she say anything about what I'll call an alternative plan if they couldn't get hold of Tawyka what [*sic*] they were going to do?

A. She didn't say they were going to do it, but they wanted her to, and if she couldn't do Tawyka to get–to do Cal. She never told me that she was going to do it, but that was the alternative, that was what the next plan would have been.

Q. Was that they wanted to?

A. (Nodding head up and down).

Q. Did you know at that point in time was she able to–did she tell you whether she was able to get hold of Tawyka Bonds?

A. She wasn't able to because she said she was glad she wasn't [*sic*] because she didn't want to set him up to be robbed."

Banner subsequently identified defendant as the person that she referred to as "Jamaica."

¶ 19    Defendant first argues that Bell's conversation with Banner was not in furtherance of the conspiracy since Bell was "actually hoping that the conspiracy would not come to fruition." Defendant cites no authority for the proposition that a coconspirator's wishes regarding the success of the venture has any bearing on the admissibility of her statements pursuant to the coconspirator exception. Bell did not withdraw from the conspiracy; while her heart may not have been in it, she was, as Banner testified, "trying to contact *** Tawyka to find out where he lived because someone wanted to rob him." Further, Bell wished only that Bonds not get robbed; she stated no such reservations about the success of the alternative plan to rob "Cal."

¶ 20    Defendant also argues that a statement made to a nonconspirator about the details of the planned crime before it occurred is not a statement made in furtherance of the conspiracy and, thus, not admissible. We first note that the fact that a statement is made to a nonconspirator does not, alone, make the statement inadmissible under the coconspirator exception. See *People v. Redeaux*, 355 Ill. App. 3d 302, 305 (2005). However, defendant also argues that the statement was not made in furtherance of the conspiracy. As noted, statements made in furtherance of a conspiracy include those that have the effect of "advising, encouraging, aiding or abetting its perpetration." *Kliner*, 185 Ill. 2d at 141.

¶ 21    The State apparently misapprehends exactly what testimony defendant is contesting. In its brief, the State refers to "Banner's testimony regarding what her sister, Bell, *said on the phone*" and states that "Banner *overheard* Bell identifying her own role in the conspiracy as the provider of information concerning the whereabouts of the conspiracy's targets." (Emphases added.) However, in his brief, defendant recounts only Banner's testimony regarding her conversation with Bell *after* the telephone calls, not what Banner overheard during the calls. This misunderstanding calls into question the State's argument that statements further a conspiracy "where they identify coconspirators and their roles in the

-7-

conspiracy, or *** inform other conspirators of the activities or status of the conspiracy." For this argument, the State relies on *United States v. Hitow*, 889 F.2d 1573, 1581 (6th Cir. 1989). *Hitow* cited to *United States v. Magee*, 821 F.2d 234, 244 (5th Cir. 1987), to support its assertion that statements "identifying other conspirators and their roles in the conspiracy" had been found to be in furtherance of a conspiracy. *Hitow*, 889 F.2d at 1581. However, a closer look at *Magee* reveals its finding to be that "[o]rdinarily, a statement that identifies the role of one co-conspirator *to another* is in furtherance of the conspiracy." (Emphasis added.) *Magee*, 821 F.2d at 244. Thus, *Hitow*'s liberal extension of *Magee*'s finding, and the State's reliance on it in this case, are on shaky ground. If Banner had overheard Bell making the contested statements to one of the coconspirators on the telephone, such an argument would at least be relevant. However, such is not the case here.

¶ 22    The circumstances of Bell's statements to Banner are similar to those presented in *People v. Link*, 100 Ill. App. 3d 1000 (1981). In *Link*, the uninvolved girlfriend of a conspirator in a murder-for-hire scheme testified that, before the murder was committed, her boyfriend told her of his involvement in the scheme and various facts about the proposed murder. *Id.* at 1003. This court "fail[ed] to see *** how the premurder statements to one who was not a co-conspirator can be termed in furtherance of the conspiracy." *Id.* at 1006. We agree with our brethren's vision in *Link* and conclude that Bell's conversation with Banner was not in furtherance of the conspiracy. Such a conclusion is based on long-standing precedent in this state:

> "Declarations, that are merely narrative as to *what has been done or will be done*, are incompetent and should not be admitted except as against the defendant making them, or in whose presence they are made." (Emphasis added.) *Spies v. People*, 122 Ill. 1, 237 (1887).

Bell's statements to Banner, a nonmember of the conspiracy, were nothing more than a narrative of what Bell had done and what the plans were for later that evening. These statements were not made in furtherance of the conspiracy and were thus not admissible under the coconspirator exception.

¶ 23    The State argues that, in any event, the statements were admissible as evidence of Bell's state of mind. Under the state-of-mind exception to the hearsay rule, the rule will not exclude:

> "A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including:
>
> ***
>
> (B) a statement of declarant's then existing state of mind, emotion, sensation, or physical condition to prove the state of mind, emotion, sensation, or physical condition of another declarant at that time or at any other time when such state of the other declarant is an issue in the action." Ill. R. Evid. 803(3)(B) (eff. Apr. 26, 2012).

The State argues that "Bell's expression of relief that the conspirators were acting on their alternative plan to rob Juggins rather than her ex-boyfriend, Bonds–unquestionably qualified for admission as a statement by Bell regarding her then-existing state of mind." We disagree.

First, we note that Bell did not state that the coconspirators were, indeed, acting on the alternative plan to rob Juggins. As Banner testified when questioned:

"Q. Did she [Bell] say anything about what I'll call an alternative plan if they couldn't get hold of Tawyka what [*sic*] they were going to do?

A. *She didn't say they were going to do it*, but they wanted her to, and if she couldn't do Tawyka to get–to do Cal. *She never told me that she was going to do it*, but that was the alternative, that was what the next plan would have been." (Emphases added.)

Further, Bell testified that she called Bonds once more *after* the coconspirators met at Banner's house, and she also led them to a house where she thought that Bonds might be before leading them to Juggins' apartment. Bell could not have been expressing relief that the coconspirators were acting on their alternative plan, as the State argues, because the plan to rob Bonds was still viable. In addition, even if Bell were speaking about acting on the alternative plan to rob Juggins, it would not have been admissible. As the committee comment to Rule 803 explains:

"Consistent with prior Illinois law, Rule 803(3)(B) provides that the hearsay exception for admissibility of a statement of intent as tending to prove the doing of the act intended applies only to the statements of intent by a declarant to prove her future conduct, *not the future conduct of another person*." (Emphasis added.) Ill. R. Evid. 803, Committee Comment (adopted Sept. 27, 2010).

Banner's testimony about her conversation with Bell was admitted in error.

¶ 24    However, not every error is reversible error, and we would conclude that the admission of this testimony was harmless and, thus, not reversible error. An erroneous evidentiary ruling constitutes harmless error if the State can establish beyond a reasonable doubt that the error did not contribute to the jury's verdict. *People v. Patterson*, 217 Ill. 2d 407, 428 (2005). In deciding whether error is harmless, a reviewing court may "(1) focus on the error to determine whether it might have contributed to the conviction; (2) examine other properly admitted evidence to determine whether it overwhelmingly supports the conviction; or (3) determine whether the improperly admitted evidence is merely cumulative or duplicates properly admitted evidence." *People v. Becker*, 239 Ill. 2d 215, 240 (2010). First, we note that the complained-of testimony here involves the conspiracy to rob Juggins only if the coconspirators could not rob Bonds. Both Bell and Giles also properly testified about this conspiracy. Thus, Banner's testimony was merely duplicative. Further, it covered only the early stages of the conspiracy and did not discuss the ultimate actions for which defendant was charged. Other evidence in this case included testimony much more immediate to the actual commission of the crimes charged–that of Bell, covered above, and Giles, who was at the scene of Juggins' murder. Without delving into Giles' extensive testimony, we note that his testimony involved the conspiracy and his eyewitness account of the home invasion, murder, and robbery. Banner's complained-of testimony was of such little consequence that we cannot conclude that it contributed to defendant's conviction. Thus, even though defendant's claim of error is valid, we would grant him no relief.

¶ 25    Defendant next contends that the trial court improperly admitted the prior consistent statement of the State witness Stacy Daniels. Defendant admits that trial counsel neither

objected at trial nor included this issue in his posttrial motion; however, he asks this court to review the issue as plain error or, in the alternative, ineffective assistance of counsel. The State agrees that there was error and contests only the impact of the improper testimony.

¶ 26     In the State's case-in-chief, Daniels testified that she lived with Juggins and their 15-month-old son on February 10, 2003. As the three of them slept on the same mattress on the bedroom floor, Daniels heard someone kick in the front door of their apartment. She rolled onto her stomach and pulled the covers over her head as her son began to scream and cry. She felt two people step over her legs to the side of the bed where Juggins lay. Juggins and a "black male voice" exchanged words, and Daniels felt "tussling." She then heard a gunshot, and she felt the two people step back over her legs. She pulled off the covers and saw Juggins lying unresponsive.

¶ 27     Daniels left the bedroom and entered the living room, and she saw a person leave the apartment and enter the building's laundry room. A second person, on her right, pushed her forehead, and then a third person came out of the bedroom and brushed her left arm. The second and third persons walked out of the apartment and turned left, into the laundry room. Daniels never saw the face of the first person, but she could tell that the other two had masks on their faces.

¶ 28     At trial, Daniels described the first person leaving the apartment as six feet tall. On cross-examination, the following colloquy took place:

"Q. Now, I want to ask you some questions about the first person who you saw leave. You just said that you now estimate that this person was about six foot; is that true?

A. Yes.

Q. By six foot, would you describe that, would that be the same to you as being medium height?

A. No.

Q. What would medium height be to you?

A. Um, like five, six; five, seven.

Q. Okay. Now, isn't it true that on–you gave a previous statement on December 10th, 2009, and in that statement–

* * *

Q. Miss Daniels, do you remember being asked this question and giving this answer? 'Question: Do you know, can you describe anything physically about the first guy? Answer: The first guy? I don't know. I believe like he was a little bit stockier than the other. Like to me he seemed like a little bit more built. He didn't look that tall, but he was medium height. He wasn't short.' Do you remember being asked that question and giving that answer?

A. I believe so.

Q. Is it fair to say that your memory of the events was better right after this incident happened than it is today?

A. Um, my memory is the same. Just that–what happened that night, you guys asked

-10-

me what time stuff happened, what people looked like, what they have on. When you're in that situation you don't think of the time or what they have on. This was wintertime. I believe they had to have like coats, winter coats. So to me that was medium built to me. So my memory, I can tell you from front to back, back to front what happened, but I can't tell you who was in that apartment."

On redirect examination, the following took place:

"Q. Miss Daniels, I want to talk to you about this question and answer that defense counsel asked you about the medium height. Do you remember that?

A. Yes.

Q. And she also followed it up by saying, asking you a question about whether your memory was better that night or today some eight years later; is that correct?

A. Yes.

Q. And as far as whether it was a–whether you described it back in 2009 at a deposition as a medium height or not, isn't it true that within a couple of hours after this incident you had a discussion with Detective Dan O'Shea from the Elgin Police Department?

A. Yes.

Q. And isn't it true at that point in time that you described this person, the number one person, as approximately six foot tall and the tallest of the three?

A. Yes."

¶ 29    In general, a prior statement that is consistent with a witness's trial testimony is inadmissible to bolster that witness's credibility (*People v. Ramos*, 318 Ill. App. 3d 181, 187 (2000)) or to rehabilitate a witness who has been impeached by a prior inconsistent statement (*People v. Rodriguez*, 58 Ill. App. 3d 562, 569 (1978)). Here, defendant properly impeached Daniels' trial testimony that the first man she saw leaving the apartment was six feet tall with her statement in the 2009 deposition that "He didn't look that tall, but he was medium height. He wasn't short." However, defense counsel went beyond that impeachment with his follow-up question of whether it was "fair to say that your memory of the events was better right after this incident happened than it is today." This follow-up question was akin to incomplete impeachment; it implied either that Daniels' deposition answer was given "right after this incident happened" and was more accurate or that her trial testimony was somehow different from what she expressed "right after this incident happened." Neither of these inferences could properly be drawn from the evidence or proved with other evidence. Defendant did not merely impeach Daniels with her 2009 inconsistent statement; he attempted to bolster the 2009 statement and further denigrate her trial testimony with the unfounded insinuations that the deposition answer, given more than six years after Juggins' murder, was given "right after this incident happened" or that some other description given "right after this incident happened" was more accurate. The State did not merely attempt to rehabilitate Daniels or bolster her testimony; it sought to address the improper insinuations raised by defendant. We do not easily or often find that a defendant has opened the door for admission of a prior consistent statement by impeaching a witness with a prior inconsistent statement. See *People*

*v. Ciavirelli*, 262 Ill. App. 3d 966, 982 (1994). However, defendant raised the issue of the quality of Daniels' "memory of the events *** right after this incident"; this was outside of the impeachment of Daniels with her prior inconsistent statement, and defendant cannot now complain that the State followed up on that issue. Disagreeing with both defendant and the State, we find no error here.

¶ 30    Even if we were to find that the trial court improperly allowed Daniels' testimony about her statement on the night of the murder, we would not find this to be reversible error. Illinois Supreme Court Rule 615(a) provides: "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). We conclude that the admission of the prior consistent statement did not affect a substantial right and should be disregarded. Daniels never identified defendant as the first person she saw leave her apartment after Juggins was killed. She never saw the face of that person. Further, when questioned on cross-examination about her memory of that night, she stated, "I can't tell you who was in that apartment." In the prior consistent statement, Daniels described the first person she saw leaving the apartment as "approximately six foot tall." At trial, Robinson's sister, Genores Robinson, who had dated defendant, testified that defendant was "tall"–approximately 6 feet 6 inches. We do not conclude that the admission of Daniels' statement–a description of an unknown person, which did not fit that of defendant (but was less incorrect than the description in her prior inconsistent statement)–affected a substantial right.

¶ 31    Similarly, we do not conclude that defense counsel was ineffective in his actions regarding this statement. To succeed on a claim of ineffective assistance of counsel, a defendant must establish both that counsel's representation was deficient and that the defendant was substantially prejudiced by the deficient performance. *People v. Williams*, 391 Ill. App. 3d 257, 269 (2009). A lack of substantial prejudice is fatal to a claim of ineffective assistance. *Id.* The admission of Daniels' prior consistent statement was not of such a magnitude that defendant suffered substantial prejudice and was denied a fair and impartial trial.

¶ 32    For these reasons, the judgment of the circuit court of Kane County is affirmed.

¶ 33    Affirmed.