# Illinois Official Reports

## Appellate Court

---

### *People v. Jaimes*, 2019 IL App (1st) 142736

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DENNIS JAIMES, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-14-2736 |
| Filed<br>Rehearing denied | June 6, 2019<br>July 11, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CR-6894; the Hon. Domenica A. Stephenson, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Daniel T. Mallon, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Christine Cook, and Clare Wesolik Connolly, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE BURKE delivered the judgment of the court, with opinion.<br>Presiding Justice McBride concurred in the judgment and opinion.<br>Justice Gordon dissented, with opinion. |

**OPINION**

¶ 1      Following a jury trial, defendant, Dennis Jaimes, was convicted of first degree murder but acquitted of aggravated discharge of a firearm. The jury also found that the State failed to prove that defendant personally discharged a firearm that caused death. The trial court subsequently sentenced him to 30 years' imprisonment. On appeal, defendant contends that (1) when the jury submitted multiple notes during its deliberations, in which he asserts the jury asked whether it could find him guilty under a theory of accountability despite not being instructed on that theory of guilt, the trial court erred by not rejecting the jury's consideration of the theory and (2) he was denied a fair trial when the court allowed the State to introduce into evidence several statements made by nontestifying co-offenders under the coconspirator exception to the hearsay rule. For the reasons that follow, we affirm.

## I. BACKGROUND

¶ 2

¶ 3      On the night of January 19, 2010, William Diaz and Daniel Rodriguez were standing on a street corner when someone dressed in all black walked toward them and shot a firearm in their direction multiple times. Rodriguez was uninjured, but Diaz died from a gunshot wound. After defendant was identified as the shooter, he was indicted with 36 counts of first degree murder of Diaz, 3 counts of attempted murder of Rodriguez, and 1 count of aggravated discharge of a firearm in the direction of Rodriguez. In several of the counts of first degree murder, the State alleged that defendant personally discharged the firearm that caused Diaz's death.

¶ 4      Prior to trial, the State filed a motion, which it subsequently amended, seeking to introduce into evidence several incriminating statements made by defendant's alleged coconspirators, including statements made before the shooting of Diaz and statements made in the immediate aftermath of the shooting. For most of the statements, the State sought to admit them as statements made by coconspirators in furtherance of a conspiracy, and for others, the State sought to admit them as tacit admissions by defendant, who allegedly was present when the statements were made. Defendant responded to the motion, objecting to the admission of the various statements, in part because he was not involved in any conspiracy and the statements allegedly made in his presence did not qualify as tacit admissions. But regardless, according to defendant, he argued that the trial court should hold a pretrial hearing with witness testimony to determine whether the statements should be admissible. The trial court rejected defendant's request for a hearing, and based on the State's proffer of evidence contained in its motion, it allowed most of statements to be introduced at trial under the coconspirator exception to the hearsay rule but also allowed certain statements made allegedly in defendant's presence to be admitted as tacit admissions.

¶ 5      The case proceeded to trial, where the State pursued only three of the counts against defendant. One count was for first degree murder in that defendant intentionally or knowingly shot and killed Diaz, and another count was for first degree murder in that defendant shot and killed Diaz knowing that such an act created a strong probability of death or great bodily harm to Diaz. For both counts, the State alleged that, during the commission of the offenses, defendant personally discharged the firearm that proximately caused Diaz's death. The final count was for aggravated discharge of a firearm in that defendant knowingly or intentionally discharged a firearm in the direction of Rodriguez.

¶ 6                                   A. Opening Statements and Trial

¶ 7         In the State's opening statement, it informed the jury that its evidence would show defendant armed himself on the night in question looking to shoot a rival gang member and did so when he fired his weapon at Diaz and Rodriguez, which resulted in Diaz's death.

¶ 8         The evidence at trial showed that, during January 2010, there was an ongoing feud between the Two-Six and Latin Kings gangs. On January 19, 2010, members of the Two-Six gang were at Luis Aguado's house, including Victor Perez, Gilberto Fuentes, Ruben Maldonado, Eric Jaro, Carlos Ruiz, Cesar Azteca, defendant, and possibly another person nicknamed "Creeper." The State introduced much of what occurred while the group was at Aguado's house through the substantive admission of the grand jury testimony of Aguado, Perez, and Fuentes, who all testified at trial.

¶ 9         While the group was hanging out, some of them, in particular Aguado and Maldonado, began discussing shooting and killing a member of the Latin Kings. Maldonado remarked that the group had to start retaliating more against the gang. The group discussed using Azteca's vehicle, and defendant stated that, if they were serious about the plan, he could obtain a firearm. The group's plan was to drive around the territory of the Latin Kings and search for individuals who were bald and wearing baggy clothes with the gang's colors. Although many in the group were eager to participate, only Jaro, defendant, Ruiz, and Maldonado went, although Creeper may have also joined them. Ruiz volunteered to be the driver, and as defendant and Maldonado were walking to Azteca's minivan, Aguado heard them discussing which one wanted to be the shooter.

¶ 10        Later that night, at around 9 p.m., Diaz and Rodriguez, both members of the Latin Kings, were standing near the corner of 27th Street and Christiana Avenue in Chicago. At the time, according to Rodriguez, who testified at trial, they were concerned about retaliation from another gang. It was dark, and while they were outside waiting for their friend, Carlos Andrade, Rodriguez observed an individual dressed in all black walking toward them. Although Rodriguez could tell the person was male, he could not immediately determine the person's race. When that person was about seven feet away, Rodriguez turned his head away and heard multiple gunshots. Rodriguez looked back toward the person, who he identified at trial as defendant, and saw defendant shooting in his and Diaz's direction. Once the shooting stopped, Rodriguez noticed Diaz was bleeding and called 911. Rodriguez was uninjured, but Diaz ultimately died as a result of a single gunshot wound.

¶ 11        The police arrived shortly afterward. A responding officer told Rodriguez to leave the area, which Rodriguez did without mentioning anything about the shooting. During the police's search of the area, they did not recover any shell casings, indicating that a revolver had been used. The police also reviewed the 911 calls of the shooting and located Rodriguez's number. An officer called Rodriguez, but he told the officer that he did not know anything about the shooting and only called because he saw someone had been shot. Later during the investigation, a detective contacted Rodriguez, and they met, but Rodriguez again asserted he did not know anything about the shooting.

¶ 12        The majority of what occurred after the shooting concerning members of the Two-Six gang came in through the substantive admission of the grand jury testimony of Aguado, Perez, and Fuentes.

¶ 13        According to Aguado's grand jury testimony, the night of the shooting, Jaro returned to Aguado's house with the keys to Azteca's vehicle. Aguado and Azteca both entered Azteca's

vehicle, where Jaro told Aguado that defendant was "a crazy a***" and "snapped." Aguado interpreted Jaro's comments to mean that defendant did the shooting. Also in the vehicle, Aguado heard Maldonado telling Azteca not to worry about any evidence of the shooting being in his vehicle because the shooter had jumped out of the vehicle, ran through a gangway, and then fired the shots. At one point, according to Aguado, Maldonado told Azteca that "I caught a flake on the next block," meaning a Latin King had been shot. Maldonado cautioned the occupants of the vehicle to be careful and perhaps stay inside because the Latin Kings were probably going to retaliate. Later that night while the group was driving around in Azteca's vehicle, defendant received a phone call and learned that the person who had been shot was dead and that he was a "chief" in the Latin Kings. In response, defendant smiled, laughed, and displayed a Two-Six gang sign. Aguado asked defendant who shot the Latin King, and defendant responded by again displaying a Two-Six gang sign.

¶ 14    According to Perez's grand jury testimony, the day after the shooting, he saw Maldonado on the street, and they walked together to the residence of a friend, Andrew Linares, who was in the process of moving. Maldonado told Perez that they had "smoked a King" the previous night, which Perez interpreted as killing a member of the Latin Kings. They arrived at Andrew's residence, where they joined Andrew and Andrew's brother, Jorge Linares.[1] There, Maldonado told Perez in more detail what happened. Maldonado said the group found a Latin King near the intersection of 27th Street and Christiana Avenue, defendant jumped out of the vehicle, and shortly thereafter, Maldonado heard multiple gunshots. Defendant came running back to the vehicle, and they sped away.

¶ 15    According to Fuentes's grand jury testimony, on the day after the shooting, he went to Aguado's house, where Aguado told him that the group had killed a Latin King. Fuentes "guess[ed]" that defendant had been the shooter. The next day, Fuentes was with Aguado and Jaro, when Jaro told Fuentes about the shooting, specifically that defendant was the shooter. The day after Fuentes saw Jaro, Fuentes saw Maldonado, who was bragging about killing a Latin King. Maldonado said that the group had parked a block away, ran through a gangway, and shot a Latin King, though he did not say who had been the shooter. At trial, during cross-examination, Fuentes testified that, on January 21, 2010, a fellow member of the Two-Six gang, "Poncho," was shot and killed, and on that same date, Fuentes himself was shot at by members of the Latin Kings.

¶ 16    On February 2, 2010, the police executed an unrelated search warrant on Andrew's residence, found a handgun and drugs, and arrested him. Andrew, who testified at trial, admitted to the police that he was a member of the Two-Six gang and that the contraband they found was his. Because of his gang affiliation, an officer asked if he had heard anything about "a shooting." Andrew, who believed he would help his own case by giving the police information, told the officer that an "affiliate member" told him about a shooting that occurred around January 20. Andrew informed the police that, around that date, he was moving out of an apartment with the help of Jorge, when Perez and Maldonado came over. Maldonado told Andrew that he was driving around with defendant in the territory of the Latin Kings the previous night. Maldonado said he observed two males on the street corner on Christiana Avenue, he and defendant exited the vehicle, and "there were shots fired." However, Andrew acknowledged at trial that he told the police about defendant's involvement during a second

_____

[1]Andrew Linares will be referred to as Andrew, and Jorge Linares will be referred to as Jorge.

interview, not the initial one. Andrew also told the police that, a couple days after he moved, he was walking down the street with Ruiz, who became paranoid when a vehicle passed them. Ruiz explained to Andrew that "they had kicked off the war between the Latin Kings and the Two-Six" gangs, and Ruiz "thought they were coming back to retaliate." Andrew ultimately received probation based on the charges filed against him.

¶ 17    After the police spoke to Andrew, they questioned Jorge in an attempt to corroborate Andrew's claims, and Jorge provided similar information. As a result, the police believed that defendant, Maldonado, Jaro, and Ruiz were involved in the shooting death of Diaz. The police subsequently brought Maldonado, Aguado, Fuentes, and Perez to the police station for questioning. Although the police recorded Maldonado's interview, they did not record the interviews of Aguado, Fuentes, or Perez. Because their stories generally were consistent with one another, the police thought they were telling the truth. Later that same day, the police brought defendant to the police station for questioning, but he was eventually released.

¶ 18    After Aguado, Fuentes, and Perez had been interviewed by the police, they testified before a grand jury. Some days later, the police interviewed Andrade, and based on that interview, they needed to interview Rodriguez again, who at the time was on special gang probation. On February 24, 2010, Rodriguez, who had recently been arrested for reckless conduct, was in police custody. The police interviewed Rodriguez in connection with the shooting of Diaz, during which he identified defendant in a photo array as the shooter. The police subsequently arrested defendant, and Rodriguez identified him again in a lineup as the shooter.

¶ 19    As previously mentioned, the majority of the evidence concerning the planning and execution of the shooting of Diaz was introduced through the substantive admission of the grand jury testimony of Aguado, Perez, and Fuentes. At various points in the trial, they each denied making certain statements to the grand jury or could not remember making certain statements. Additionally, all three testified that the police threatened to charge them with murder if they did not cooperate. The police officers and assistant state's attorneys who testified for the State at trial all denied the allegations made by Aguado, Perez, and Fuentes.

¶ 20    In defendant's case, Cook County probation officer Mark Dovin testified that, while Rodriguez was on probation, he reported to Dovin multiple times in January and February 2010 as a condition of his probation. At all times, Rodriguez denied knowing anything about a shooting or the gang conflict between the Two-Six and Latin Kings gangs.

¶ 21    Jorge also testified that, at some time in January 2010, he was helping his brother move when Maldonado and Perez arrived. Although Jorge did not hear all of the ensuing conversation between Andrew, Maldonado, and Perez, he heard Maldonado mention something about a shooting near 27th Street and Christiana Avenue, but Maldonado never mentioned who the shooter was. Jorge also confirmed that he gave a statement to an assistant state's attorney in early February 2010, wherein he indicated that Maldonado mentioned to Perez and Andrew that he (Maldonado) had taken care of business the night of the shooting.

¶ 22                                              B. Jury Instructions

¶ 23    During the jury instructions conference, the parties agreed to several instructions. One informed the jury that defendant had been charged with first degree murder and aggravated discharge of a firearm. Another told the jury the State had alleged that, during the commission of the first degree murder, defendant personally discharged the firearm that caused Diaz's death. Other instructions provided the jury with the elements necessary to prove first degree

murder, the elements necessary to prove defendant personally discharged the firearm that caused Diaz's death, and the elements necessary to prove aggravated discharge of a firearm. Another instruction informed the jury that, if it found defendant not guilty of first degree murder, it should not consider the allegation that defendant personally discharged the firearm that caused Diaz's death. Conversely, this instruction informed the jury that, if it found defendant guilty of first degree murder, it should consider whether the State had proven beyond a reasonable doubt that defendant personally discharged the firearm that caused Diaz's death.

¶ 24   Defendant, however, requested a non-Illinois pattern jury instruction that would have informed the jury that he was not charged under a theory of guilt by accountability or conspiracy and directed the jury to limit its consideration of the case solely to whether the evidence at trial proved he directly committed the offenses. The requested instruction also would have informed the jury that, if it concluded that someone else might have directly committed the offenses with defendant's help in some manner, then it must find him not guilty. The State objected to the instruction, arguing that it did not help explain the issues of the case and would confuse the jury. The trial court rejected the requested instruction, finding that the other instructions adequately covered the issues of the case.

¶ 25                                C. Closing Arguments

¶ 26   In the State's closing argument, it contended that the evidence showed defendant shot and killed Diaz and shot at Rodriguez. In defendant's closing argument, he contended that, for various reasons, Rodriguez could not be believed as a witness. And beyond Rodriguez's testimony, defendant posited that the other evidence connecting him to the shooting could be explained away by various reasons, including witnesses trying to protect themselves or police coercion. Lastly, defendant highlighted the evidence indicating that Maldonado was the shooter.

¶ 27                                D. Jury Deliberations

¶ 28   During the jury's deliberations, the jury sent out two notes. The first asked: "Can we find guilty of first degree but not guilty of discharging and aggravated?" The second asked: "Please define what is intended as an 'act' in first degree murder." The trial court considered the first question first. Both parties discussed the note and were unclear exactly what the jury meant. The court attempted to interpret the question and construed it as asking "can they find him not guilty of personally discharging a firearm—if they can find him not guilty of discharging a firearm and not guilty of aggravated discharge of a firearm, that answer would be yes." One of defendant's attorneys cautioned about "speculat[ing]" as to the jury's question and suggested asking the jury to clarify its question. An assistant state's attorney agreed that asking the jury to clarify its question was appropriate but suggested different wording from defendant's attorney. Another of defendant's attorneys suggested that the trial court refer the jury to specific instructions and if it still had a question, to be more specific. In response, the court noted that the jury's question was one of law, which it was "supposed to answer," if possible, and simply referring the jury back to the original instructions may not answer the question. The parties then agreed that the court should have the jury clarify its question. The court proposed responding to the jury with: "Please clarify your question," and asked if either party had an objection. Neither party objected, and the court instructed the jury accordingly.

- 6 -

¶ 29     After answering the jury's first question, the trial court considered the second question. The court noted that Illinois Pattern Jury Instructions, Criminal, No. 4.01 (approved July 18, 2014) (hereinafter IPI Criminal), which defined "act" as including "a failure or omission to take action," was inapplicable based on the facts of the case, to which both parties agreed. The court further determined that the question was one of fact and asked for the parties' input. One of defendant's attorneys highlighted the non-Illinois pattern jury instruction it had unsuccessfully proposed during the instructions conference related to guilt by accountability. In response, the court noted that the instruction did not "have any case law cited," so it could not be said that the instruction accurately stated the law. The court asserted that it would not give the instruction "even in light of [the jury's] question." The court then proposed the following language: "You have received the evidence and the instructions. Please continue to deliberate." The court asked if there was any objection, and neither party objected. The court instructed the jury accordingly.

¶ 30     Immediately after the trial court responded to the jury's second note, the jury sent out a third note, which asked: "Are each of the three charges independent of each other? If not, which charges must be in tandem?" After reading the question, the court remarked that the question "was even more confusing" and noted that the jury could not even consider the personal discharge allegation until it first found defendant guilty of first degree murder. In response, an assistant state's attorney observed that an already provided instruction informed the jury of that, but "apparently [the jury was] not following or understanding it." One of defendant's attorneys asserted that she did not understand how the jury could view the charges or the personal discharge allegation as "in tandem considering the evidence that [it] received is only one person." Another of defendant's attorneys suggested pointing the jury to People's instruction No. 23, or IPI Criminal No. 28.04, which instructed the jury to only consider the personal discharge allegation if it first found defendant guilty of first degree murder. Conversely, that instruction directed the jury not to consider the personal discharge allegation if it found defendant not guilty of first degree murder.

¶ 31     In response, the trial court noted that it could not direct the jury to just one instruction to sufficiently answer its question and that it was "not supposed to highlight any one instruction over another." Another one of defendant's attorneys suggested simply instructing the jury to "refer to your jury instructions." The State proposed: "[R]efer back to the jury instructions. The answer is in the jury instructions." One of defendant's attorneys indicated that they would "agree with that" response. The court then proposed the following language: "You have received all of the evidence and the instructions. Please continue to deliberate." The court asked if there was any objection, and neither party objected. The court instructed the jury accordingly.

¶ 32                                      E. Verdict and Sentencing
¶ 33     Less than 30 minutes after the trial court responded to the third note, the jury found defendant guilty of first degree murder but found that the State failed to prove that he personally discharged the firearm that caused Diaz's death. The jury also acquitted defendant of aggravated discharge of a firearm. Defendant filed a motion for new trial, and while he argued in part that the jury's verdicts were inconsistent, he raised no argument related to the trial court's responses to the jury notes. Also in the motion, defendant argued that the court improperly allowed the State to introduce the statements by his coconspirators because, even if defendant had been involved in a conspiracy with the declarants, the statements were not

- 7 -

made during or in furtherance of the conspiracy. The court denied his motion and sentenced him to 30 years' imprisonment.

¶ 34    Defendant subsequently appealed.

¶ 35                                    II. ANALYSIS
¶ 36                              A. Responses to Jury Notes
¶ 37    Defendant first contends that the trial court's responses to the jury notes were erroneous. Defendant argues that, based on the notes, the jury was asking whether it could find him guilty based on a theory of accountability, despite the State never prosecuting him based on such a theory. According to defendant, instead of asking the jury to clarify its first note and then instructing the jury to continue deliberating in response to the second and third notes, the court should have made clear to the jury that it could not find him guilty of first degree murder if it found that the State failed to prove he was the shooter.

¶ 38    Initially, defendant concedes that he did not include this contention of error in a posttrial motion, and we separately note that he never objected to the trial court's proposed responses to the jury. Together, these two failures mean that he has forfeited the claim of error for review. See *People v. Thompson*, 238 Ill. 2d 598, 611 (2010) ("To preserve a claim for review, a defendant must both object at trial and include the alleged error in a written posttrial motion."). But defendant argues that, under Illinois Supreme Court Rule 451(c) (eff. Apr. 8, 2013), "substantial defects" in jury instructions "are not waived by failure to make timely objections thereto if the interests of justice require." When a defendant invokes review under Rule 451(c), we utilize the plain-error doctrine to review the claim of error. *People v. Durr*, 215 Ill. 2d 283, 296-97 (2005). Under the plain-error doctrine, we may review an unpreserved claim of error when there was a clear or obvious error and either (1) the evidence was so closely balanced that the error itself threatened to tip the scales of justice against the defendant, regardless of the gravity of the error, or (2) the error was so serious that it resulted in an unfair trial to the defendant and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Sebby*, 2017 IL 119445, ¶ 48.

¶ 39    The State, however, asserts that plain-error review is inapplicable because defendant affirmatively acquiesced to the trial court's responses to the jury notes. Under the invited-error doctrine, "a party cannot complain of error that it brought about or participated in." *People v. Hughes*, 2015 IL 117242, ¶ 33. Specific to this case, "[w]hen a defendant acquiesces in the trial court's answer to a question from the jury, the defendant cannot later complain that the trial court's answer was" erroneous. *People v. Averett*, 237 Ill. 2d 1, 23-24 (2010). Two recent cases, *People v. Lawrence*, 2018 IL App (1st) 161267, and *People v. Boston*, 2018 IL App (1st) 140369, both from this division of the First District, guide our analysis.

¶ 40    In *Lawrence*, 2018 IL App (1st) 161267, ¶ 17, the jury sent out a note with two questions, one indicating that it was deadlocked and asking what to do next as well as a question about obtaining transcripts of the testimony of two witnesses. After the trial court discussed the note with the parties, it stated that it would inform the jury to continue deliberating with respect to the first question. *Id.* ¶ 18. The defendant's attorney agreed with the trial court, stating " '[r]ight,' " but suggested multiple responses with respect to the jury's second question, some of which the court incorporated. *Id.* Shortly after the court responded to the jury, it returned a guilty verdict. *Id.* ¶ 19. On appeal, the defendant contended that the trial court coerced his guilty verdict by instructing the deadlocked jury to continue deliberating. *Id.* ¶ 49. This court,

however, found that, because his attorney agreed with the trial court's response to the first question, he had acquiesced to the manner in which the court proceeded. *Id.* ¶ 53. And therefore, the defendant could not complain about the trial court's decision on appeal and could not invoke plain-error review, which concerned procedural defaults, not instances of affirmative acquiescence. *Id.* ¶¶ 53-54.

¶ 41　　In *Boston*, 2018 IL App (1st) 140369, ¶ 47, the jury sent out a note asking if self-defense was a mitigating factor because the " '[d]efinition of mitigating factor [was] unclear on sheet.' " During the ensuing conversation about the note, the defendant's attorney suggested a course of action that was different from what the trial court ultimately took and also agreed with the court's response, which had been initially suggested by the State, that the jury had already received the necessary instructions. *Id.* ¶ 110. There is no indication that the court explicitly asked if there was any objection to its response, and no indication that the defendant's attorney stated there was no objection to the response. See *id.* Ultimately, the jury returned a guilty verdict. *Id.* ¶ 48. On appeal, the defendant contended that the trial court's failure to clarify the issue for the jury was plain error. *Id.* ¶ 108. This court found that, because defense counsel "appear[ed] to have both suggested additional instructions *and* accepted the State's position that the jury had received the necessary instructions," there had been no "*clear* invited error." (Emphases in original.) *Id.* ¶ 111. Consequently, the invited-error doctrine did not apply, and the defendant could invoke plain-error review. *Id.*

¶ 42　　The present case blends elements of both *Lawrence* and *Boston*. Like *Lawrence*, the defense in this case indicated its agreement with the trial court's responses to the jury when it failed to object after being directly prompted by the court to raise an objection if it disagreed. See *Lawrence*, 2018 IL App (1st) 161267, ¶ 18. Conversely, like *Boston*, the defense in this case also suggested different responses than what the trial court ultimately chose but did not protest the court's actual responses to the jury. See *Boston*, 2018 IL App (1st) 140369, ¶ 110. But more like *Boston* than *Lawrence*, the defense in this case did not *clearly* invite the error and did not truly acquiesce. According to Black's Law Dictionary (10th ed. 2014), "acquiesce" means to "accept tacitly or passively." This is plainly what occurred in *Lawrence*, 2018 IL App (1st) 161267, ¶ 18, where the defense simply remarked " '[r]ight' " in response to the trial court's proposed response to the jury's first question without any apparent suggestion to the alternative. But in the present case, although the defense did ultimately agree with the trial court's responses, it was not passive, as the defense actively suggested responses the trial court could take that were different from the one it actually took. Consequently, like *Boston*, defendant did not *clearly* invite the error, and he may invoke plain-error review.

¶ 43　　With plain-error review applicable, we note that the defendant has the burden to show that an error constitutes plain error, and our first step is to determine whether a clear or obvious error occurred. *Sebby*, 2017 IL 119445, ¶¶ 49-51. We now turn to the merits of defendant's contention.

¶ 44　　During deliberations, if the jury poses a question to the trial court, it is "entitled" to have its question answered. *People v. Reid*, 136 Ill. 2d 27, 39 (1990). And generally, the "court must provide instruction when the jury has posed an explicit question or asked for clarification on a point of law arising from facts showing doubt or confusion." *Averett*, 237 Ill. 2d at 24. "When a jury makes explicit its difficulties, the court should resolve them with specificity and accuracy." *People v. Childs*, 159 Ill. 2d 217, 229 (1994). But when the jury's question "is

unclear, it is the court's duty to seek clarification of it." *Id.* The court has discretion to refuse to answer a jury's question under certain circumstances, such as

> "when the jury instructions are readily understandable and sufficiently explain the relevant law, when additional instructions would serve no useful purpose or may potentially mislead the jury, when the jury's request involves a question of fact, or when giving an answer would cause the trial court to express an opinion likely directing a verdict one way or the other." *Averett*, 237 Ill. 2d at 24.

¶ 45 Because the trial court has discretion in deciding whether to answer the jury questions (*id.*), we review its decision for an abuse of discretion (*Boston*, 2018 IL App (1st) 140369, ¶ 112). An abuse of discretion occurs only when the court's decision was arbitrary or unreasonable to the degree that no reasonable person would adopt the same view. *People v. McDonald*, 2016 IL 118882, ¶ 32. Though defendant asserts our review on this issue is *de novo*, that standard of review applies only when the issue on appeal is whether the court accurately conveyed the law to the jury in response to a question. See *Boston*, 2018 IL App (1st) 140369, ¶ 112. In this case, however, the issue on appeal is whether the court properly utilized its discretion in refusing to answer the jury's notes beyond instructing the jury to clarify and then continue deliberating.

¶ 46 In arguing that the trial court erred in its responses to the jury, defendant points us to *People v. Peoples*, 2015 IL App (1st) 121717. In that case, the defendant was charged with first degree murder, including an allegation that he personally discharged a firearm that caused death, and attempted first degree murder, including an allegation that he personally discharged a firearm. *Id.* ¶¶ 8, 44. The evidence at trial generally showed the defendant was a passenger in a van that was involved in a shootout on a street with other people, which resulted in the death of one person. *Id.* ¶¶ 10-31. While some of the witnesses identified the defendant as the shooter, others did not, and there was at least one witness who testified that another person had shot a firearm from the van. *Id.* The State never tendered a jury instruction on guilt by accountability, and in closing argument, it argued that defendant was the individual who personally shot and killed the victim. *Id.* ¶¶ 44, 46.

¶ 47 During the jury's deliberations, it sent out a series of notes, asking about the difference between first degree murder and the personal discharge allegation as well as if it could find the defendant guilty if he was part of a group who meant to kill someone. *Id.* ¶ 48. The trial court responded to the first question by telling the jury the answer was contained in the instructions and responded to the second question by telling the jury to determine the facts of the case and apply the law to those facts. *Id.* ¶¶ 48, 50. Still, the jury sent out another note, asking: " 'Can someone be guilty of first degree murder [and] not pull the trigger? We are struggling with the concept of a guilty verdict but not having enough evidence that shows or proves [the defendant] was the shooter.' " *Id.* ¶ 52. After the parties discussed the response, the court answered the jury in the affirmative over the defense's objection. *Id.* ¶ 53. Five minutes later, the jury found the defendant guilty of first degree murder and attempted first degree murder. *Id.* ¶ 55. While the jury found that, during the commission of the attempted first degree murder, the defendant personally discharged the firearm, it found that the State failed to prove that, during the commission of the first degree murder, he personally discharged the firearm causing death. *Id.*

¶ 48 On appeal, the defendant argued the trial court erred when responding in the affirmative to the jury's question about whether it could find him guilty of first degree murder yet find that he did not personally discharge the firearm that caused death. *Id.* ¶¶ 91-93. This court found

that the jury had essentially asked whether the defendant could be found guilty under a theory of accountability, and the court's response of "yes" was incorrect because the State never pursued the theory at trial. *Id.* ¶ 94. This court determined that, instead of responding with "yes," the trial court should have responded with " 'no.' " *Id.* And by informing the jury that it could find the defendant guilty based on a theory of accountability, the trial court committed reversible error by injecting a new theory of guilt into the defendant's trial. *Id.* ¶¶ 94, 97.

¶ 49    Defendant here argues that, based on the jury's notes, in particular its first note ("Can we find [defendant] guilty of first degree but not guilty of discharging and aggravated?"), it was considering whether it could convict him under a theory of guilt by accountability. Based on *Peoples*, defendant posits that the trial court should have made clear to the jury that it could not find him guilty of first degree murder if it found that the State did not prove he was the shooter.

¶ 50    When the trial court was presented with the jury's first note, both parties and the court itself were confused about the exact meaning of the note. Initially, the court attempted to interpret the question and construed it as asking whether the jury could find defendant guilty of first degree murder, but also that the State failed to prove the personal discharge allegation. But as the discussions of the note unfolded, two of defendant's attorneys indicated they were confused. One stated, "I'm not clear, your Honor," while another stated, "[c]an we not speculate as to what they mean and to ask them to clarify?" The State supported asking the jury for clarification, and the court itself later stated, "I'm not sure—are you clear on what the question is?" Ultimately, the parties below unanimously agreed that the jury's question was unclear, and accordingly, the court asked the jury to clarify. "If the question asked by the jury is unclear, it is the court's duty to seek clarification of it." *Childs*, 159 Ill. 2d at 229.

¶ 51    Although it is reasonable, as defendant suggests, to interpret the jury's first note as asking whether it could find him guilty of first degree murder, but also that the State failed to prove the personal discharge allegation, that does not necessarily mean the jury was asking the trial court whether it could find defendant guilty under a theory of accountability. While possible, the note does not definitively indicate that the jury was concerned about guilt by accountability, or the general notion of whether defendant could be convicted based on the actions of someone else. Another possible interpretation of the note is that the jury was wondering whether it could give lenience to defendant. See *People v. Jones*, 207 Ill. 2d 122, 130 (2003) (observing that, where verdicts seem inconsistent, they "can often be explained as a product of juror lenity"). Given multiple rational interpretations of the note and unanimous confusion among the parties' attorneys, we cannot fault the trial court for asking the jury to clarify its note, which is a duty it has when confronted with an ambiguous question from the jury. See *Childs*, 159 Ill. 2d at 229. As trial courts do not possess a degree of clairvoyance to read the minds of juries, we cannot say this trial court acted unreasonably in responding to the jury's first note.

¶ 52    But even assuming *arguendo* that the jury's note was actually asking whether it could find defendant guilty of first degree murder without finding he personally discharged the firearm that caused death, the trial court had no responsibility to respond in the negative to such a question. In a prosecution for first degree murder when there is an additional allegation that the defendant personally discharged a firearm that caused death, there is no requirement that the State must prove the personal discharge allegation in order to obtain a conviction on first degree murder. See *People v. Alexander*, 2017 IL App (1st) 142170, ¶¶ 43-44. The personal

discharge allegation is not an element of the offense of first degree murder, even when the victim dies from a gunshot wound. *Id.* ¶ 43.

¶ 53    These points of law are further borne out by the jury instructions, which were all based on Illinois pattern jury instructions. One of the instructions on first degree murder informed the jury that

"To sustain the charge of first degree murder, the State must prove the following propositions:

First: That the defendant performed the acts which caused the death of William Diaz; and

Second: That when the defendant, did so, he intended to kill or do great bodily harm to William Diaz; or

he knew that his acts would cause death to William Diaz; or

he knew that his acts created a strong probability of death or great bodily harm to William Diaz.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

One of the instructions on the personal discharge allegation informed the jury that

"To sustain the allegation made in connection with the offense of first degree murder, the State must prove the following proposition:

That during the commission of the offense of first degree murder, the defendant personally discharged a firearm that proximately caused death to another person. A person is considered to have 'personally discharged a firearm' when he, while armed with a firearm, knowingly and intentionally fires a firearm causing the ammunition projectile to be forcefully expelled from the firearm.

If you find from your consideration of all the evidence that the above proposition has been proved beyond a reasonable doubt, then you should sign the verdict form finding the allegation was proven.

If you find from your consideration of all the evidence that the above proposition has not been proved beyond a reasonable doubt, then you should sign the verdict form finding the allegation was not proven."

These two instructions were tied together with a third instruction that explicitly informed the jury that it was only to consider the personal discharge allegation if it first found defendant guilty of first degree murder. Conversely, that instruction explicitly precluded the jury from considering the personal discharge allegation if it found defendant not guilty of first degree murder.

¶ 54    These instructions and the law of Illinois are clear that first degree murder and a personal discharge allegation contain separate elements, and even when a victim dies from a gunshot wound, the State does not have to prove that a defendant used a firearm to sustain a conviction on first degree murder. See *id.* ¶¶ 41, 43-44. Importantly, a conviction and sentence on murder

is punishment for ending someone's life, whereas a finding on a personal discharge allegation is merely an additional penalty based upon the method of ending that person's life. See *id.* ¶ 43. Because we cannot read the jury's mind, we will never know why it found defendant guilty of first degree murder but did not find he personally discharged a firearm causing death. But the mere fact that a jury would find in this manner does not invalidate the murder conviction. As this court stated in *Alexander*, while it may be "nonsensical and unfair to allow [a defendant] to be convicted as the principal shooter in a murder but found not to have personally discharged said firearm," the law in Illinois allows it. *Id.* ¶¶ 37-38. For this reason, even if it was clear that the jury was asking whether it could find defendant guilty of first degree murder but also not find that he personally discharged the firearm that caused death, the trial court would not have been required to answer in the negative to the jury's question.

¶ 55    While defendant primarily takes issue with the trial court's response to the first note, he nonetheless argues that its responses to all three were improper. With respect to the jury's second note ("Please define what is intended as an 'act' in first degree murder?"), the court reasonably interpreted this question as one of fact, and therefore, when the court responded by directing the jury to continue deliberating, it committed no error. See *Averett*, 237 Ill. 2d at 24 (stating the court has discretion to refuse to answer a jury question "when the jury's request involves a question of fact"). With regard to the final note ("Are each of the three charges independent of each other? If not, which charges must be in tandem?"), the court correctly directed the jury to continue deliberating with the evidence and instructions already received because those instructions already informed the jury how the various charges and personal discharge allegation interacted with one another. See *id.* (stating the court has discretion to refuse to answer a jury question "when the jury instructions are readily understandable and sufficiently explain the relevant law"). As such, we cannot say the trial court acted unreasonably in responding to the jury's second and third notes.

¶ 56    Lastly, to the extent defendant argues that, based on the three notes collectively, the trial court should have realized the jury was asking whether it could convict him under a theory of guilt by accountability and therefore should have directly informed the jury that it could not consider such a theory, we also disagree that the court acted unreasonably.

¶ 57    In *Peoples*, 2015 IL App (1st) 121717, upon which defendant heavily relies, the jury's notes when viewed collectively expressly demonstrated that it was asking whether it could convict the defendant based upon a theory of guilt by accountability. One of the jury's notes asked, " 'If defendant was in van [*sic*] as part of a group who meant to kill someone, do we find him guilty?' " *Id.* ¶ 50. In the jury's final note, it asked, " 'Can someone be guilty of first degree murder [and] not pull the trigger? We are struggling with the concept of a guilty verdict but not having enough evidence that shows or proves [the defendant] was the shooter.' " *Id.* ¶ 52. These questions expressly indicated that the jury was considering guilt by accountability despite the State never pursuing the theory at trial. See *id.* ¶¶ 93-94. And when the trial court responded affirmatively to the jury rather than in the negative, the court erred by injecting a new theory of guilt into the defendant's trial. *Id.* ¶¶ 93-94, 97.

¶ 58    In the present case, after the trial court asked the jury to clarify its initial note, the jury responded by asking which charges were in tandem. This question juxtaposed with the jury's first and second note simply does not necessarily indicate that the jury was concerned about guilt by accountability like the jury notes indicated in *Peoples*. And therefore, unlike *Peoples*, the trial court responded appropriately to the jury's notes and did not inject a new theory of

guilt into defendant's trial. Accordingly, we find no abuse of discretion by the trial court and, thus, no plain error. See *People v. Coats*, 2018 IL 121926, ¶ 32 (absent an error, there can be no plain error). And because there was no plain error, we need not address defendant's alternative argument that his defense counsel was ineffective. See *People v. Hensley*, 2014 IL App (1st) 120802, ¶ 47 (where there is no plain error, there can be no ineffective assistance of counsel).

¶ 59                         B. Admissibility of Coconspirator Statements

¶ 60    Defendant next contends that his right to a fair trial was violated when several statements made by nontestifying co-offenders were introduced into evidence under the coconspirator exception to the hearsay rule. Specifically, defendant challenges some of the statements made by Jaro, Maldonado, and Ruiz about the shooting in its immediate aftermath and the days following, which were introduced into evidence through the testimony of Andrew, Aguado, Perez, and Fuentes, the latter three primarily through the substantive admission of their grand jury testimony. The challenged statements are (1) Perez's testimony that Maldonado told him the group had "smoked a King" followed by Maldonado's description of how that occurred, including defendant jumping out of the van, Maldonado hearing multiple gunshots, and defendant returning to the van; (2) Andrew's testimony that Maldonado told him that he was riding with defendant when they observed men on the corner of the street, he and defendant exited the vehicle, and "there were shots fired"; (3) Andrew's testimony that Ruiz told him that the group had "kicked off the war between the Latin Kings and the Two-Six" gangs; (4) Aguado's testimony that Jaro told him that defendant snapped, which Aguado interpreted to mean that defendant was the shooter; and (5) Fuentes's testimony that Jaro told him about the shooting, including that defendant was the shooter. Defendant argues that the statements made by Jaro, Maldonado, and Ruiz, which implicated him in the shooting, were not made in furtherance of any conspiracy or in an attempt to conceal a conspiracy, but rather were nothing more than a recitation of past events.

¶ 61    Initially, the State argues that defendant failed to preserve the issue for review as, in the trial court, he argued the statements were inadmissible because there was no conspiracy, whereas now, on appeal, he argues the statements were inadmissible because they were not made in furtherance of a conspiracy. A defendant fails to preserve an issue for review where the argument made in the trial court is "wholly distinct" from the argument made on appeal, which often occurs when the arguments require different factual bases. *Hughes*, 2015 IL 117242, ¶¶ 40, 45-46. But defendant's arguments about the admissibility of the coconspirator statements are not wholly distinct nor require different factual bases to resolve. The doctrine of forfeiture exists to ensure that parties allow the trial court the opportunity to consider any claims of error in the first instance. See *People v. Heider*, 231 Ill. 2d 1, 18 (2008). Because defendant raised similar arguments regarding the admission of the coconspirator statements, "the trial court clearly had an opportunity to review the same essential claim" that has now been raised on appeal. *Id.* Therefore, defendant's contention of error has been preserved. See *id.*

¶ 62    Regardless of defendant's forfeiture, the State argues that the trial court properly allowed the statements to be admitted into evidence. The State posits that defendant's involvement in a conspiracy to shoot Diaz, a member of the Latin Kings, did not end with, and was not isolated to, that shooting. According to the State, defendant's shooting of Diaz was part of a broader

- 14 -

conspiracy stemming from the ongoing gang feud between the Latin Kings and Two-Six gangs, in which members of the Two-Six gang desired to continue harming other members of the Latin Kings. The State asserts that, because the conspiracy was still ongoing, the statements made by Jaro, Maldonado, and Ruiz were intended to keep fellow gang members informed about the continuation of the conspiracy and, thus, in furtherance of the conspiracy.

¶ 63    Under Illinois Rule of Evidence 801(d)(2)(E) (eff. Jan. 1, 2011), a statement is not considered hearsay if "[t]he statement is offered against a party and is *** a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." In other words, "any declaration by one coconspirator is admissible against all conspirators where the declaration was made during the pendency of and in furtherance of the conspiracy." *People v. Kliner*, 185 Ill. 2d 81, 141 (1998). As the State accurately points out, although defendant has framed this contention of error as one involving an exception to the hearsay rule, a statement made by a coconspirator of a party during the course and furtherance of a conspiracy is not hearsay at all. See *People v. Leach*, 2012 IL 111534, ¶ 80 n.2.

¶ 64    A conspiracy occurs when two or more people agree to commit a criminal act or acts. *Kliner*, 185 Ill. 2d at 138-39. To make a *prima facie* showing of a conspiracy, the State must show by a preponderance of the evidence that (1) two or more people wanted to commit a crime or crimes, (2) they engaged in a common plan to commit the crime or crimes, and (3) one or more of them committed an act or acts in furtherance of the conspiracy. *People v. Caraga*, 2018 IL App (1st) 170123, ¶ 37; *People v. Leak*, 398 Ill. App. 3d 798, 825 (2010). While evidence of a conspiracy may be shown with direct evidence or circumstantial evidence, the conspiracy needs to be shown with evidence independent of the hearsay statements. *People v. Spencer*, 2016 IL App (1st) 151254, ¶ 35. Moreover, the coconspirators need not be charged with conspiracy (*id.*), and a coconspirator does not have to even make the statement to another coconspirator for the statement to be admissible. See *People v. Denson*, 2013 IL App (2d) 110652, ¶ 20 (rejecting the defendant's assertion that, for a statement to be admissible under the coconspirator exception, it must be made to a coconspirator), *aff'd*, 2014 IL 116231; *People v. Redeaux*, 355 Ill. App. 3d 302, 305 (2005) (allowing police officers to testify to statements made by coconspirators). But the statements cannot be "merely a narrative of past occurrences" that "does not further any objective of the conspiracy." *Kliner*, 185 Ill. 2d at 141. A statement made in furtherance of a conspiracy includes any "that have the effect of advising, encouraging, aiding or abetting its perpetration" or relate to concealing the crime or crimes. *Id.* As the admission of evidence is a matter that the trial court has considerable discretion over, we review its ruling for an abuse of discretion, which occurs only when its decision was arbitrary or unreasonable to the degree that no reasonable person would adopt the same view. *People v. Jackson*, 232 Ill. 2d 246, 265 (2009); see also *Caraga*, 2018 IL App (1st) 170123, ¶ 50 (applying abuse of discretion standard to admissibility of coconspirator statements).

¶ 65    First, with regard to the testimony of Aguado, which concerned a statement made by Jaro that defendant snapped, the State correctly notes that the trial court allowed this statement to be introduced into evidence as a tacit admission. Under this rule, a statement is not hearsay, and admissible as evidence, when the statement is " 'incriminating in nature' " and " 'is made in the presence and hearing of an accused and such statement is not denied, contradicted, or objected to by him.' " *People v. Colon*, 2018 IL App (1st) 160120, ¶ 17 (quoting *People v. Soto*, 342 Ill. App. 3d 1005, 1013 (2003)). In defendant's reply brief, however, he posits that it was not clear from the record that he was present when Jaro made the statement. Although

defendant technically responded to the State's argument, defendant raises the claim that Jaro's statement was improperly admitted as a tacit admission for the first time in his reply brief. As claims of error raised for the first time in a reply brief are considered forfeited (*People v. Chatman*, 2016 IL App (1st) 152395, ¶ 40), defendant has forfeited any claim concerning the statement being improperly admitted as a tacit admission. In any event, the record sufficiently supports the notion that defendant was present when Jaro made the statement such that, forfeiture aside, the trial court did not abuse its discretion in allowing the statement to be introduced as a tacit admission.

¶ 66    Concerning the remaining challenged statements, when the trial court allowed the State to introduce them into evidence, the court generally found that they satisfied the three-prong test of *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978), *overruled in part on other grounds by Bourjaily v. United States*, 483 U.S. 171 (1987), and there was evidence of a conspiracy independent of the coconspirator statements.[2] In arguing the statements were admissible to the trial court, the State asserted that the conspiracy was not isolated to the shooting of Diaz but rather was an incident amid a broader conspiracy of Two-Six gang members desiring to cause harm to members of the Latin Kings. And, the State argued, the statements made by Jaro, Ruiz, and Maldonado were in furtherance of this conspiracy because, in part, they advised other gang members about the status of the conspiracy. Though the court did not state explicitly why the three-prong test had been met, it was at the very least aware of the State's reasons in support of the admissibility of the statements.

¶ 67    Initially, we agree with the State that there was evidence a conspiracy was still ongoing after the shooting of Diaz. In the State's proffer to the trial court in support of its motion and at trial, the State presented evidence that there was a gang feud between the Two-Six and Latin King gangs and that the shooting of Diaz was prompted by members of the Two-Six gang's desire to retaliate against the Latin Kings. The shooting of Diaz was not an isolated act of violence but rather, based on this evidence, a continuation of prior violence and a likely prelude to future violence in light of other evidence presented that members of the Two-Six gang were concerned about retaliation from the Latin Kings. In fact, Fuentes testified on cross-examination that, on January 21, 2010, two days after the shooting of Diaz, he was shot at by members of the Latin Kings and a fellow Two-Six gang member was killed by gunfire that day, though it was not clear at trial whether the Latin Kings were responsible for the fatal shooting. Thus, the State proved by a preponderance of evidence that the conspiracy did not end with Diaz's death but rather was still ongoing when Maldonado, Jaro, and Ruiz made statements implicating defendant as the shooter immediately after the shooting and in the following days. See, *e.g.*, *Castillo-Campos v. United States*, 987 A.2d 476, 483 (D.C. 2010) (finding ample evidence of the defendants' involvement in a broad criminal conspiracy of members of the Vatos Locos gang "to kill or otherwise 'get' " members of rival gangs). That is not to say that this gang feud could support a finding that the conspiracy lasted infinitely into the future. But we are satisfied that these statements were made sufficiently

---

[2]Although the trial court stated that the State satisfied the three-prong test of *Santiago*, the State referred to the three-prong test of *Bourjaily* in its motion. The three prongs of the *Bourjaily* test are (1) the existence of conspiracy, (2) the defendant's participation in conspiracy, and (3) the statements being made in furtherance of the conspiracy. See *Bourjaily*, 483 U.S. at 175. These three prongs are essentially what is required under Illinois Rule of Evidence 801(d)(2)(E) (eff. Jan. 1, 2011) and *Kliner*, 185 Ill. 2d at 141.

contemporaneous to the shooting such that the trial court was not unreasonable in finding that, at the time the statements were made, a conspiracy still existed.

¶ 68        Defendant, however, attempts to liken his case to *People v. Parmly*, 117 Ill. 2d 386 (1987). In that case, the defendant was among multiple people involved in a planned burglary of a home that ultimately led to the murder of the homeowner. *Id.* at 389-90. The day after the murder, one of the defendant's coconspirators told another coconspirator, who had stayed outside the house during the incident, that the defendant had fired the fatal shot. *Id.* at 390. Our supreme court found the statement inadmissible as a nonhearsay coconspirator statement because it was not made in furtherance of a conspiracy, as the burglary and murder had already occurred, and it was not in attempt to conceal the conspiracy. *Id.* at 393. The court concluded that, "[a]s a matter of common sense," the statement was made to implicate the defendant so that he "would bear the full brunt of the criminal law." *Id.* at 394. In contrast to *Parmly*, where the conspiracy was isolated to the burglary and murder, thus clearly over when the coconspirator made his statement, in the present case, the shooting of Diaz was not an isolated act of violence, but rather an associated act of violence in a gang conflict. We also note that, while the State ultimately did not present any gang experts at trial, in its proffer to the trial court in support of its motion, the State informed the court that gang experts would testify at defendant's trial about several shooting incidents between the two gangs in the two months leading up to Diaz's shooting.

¶ 69        Given our conclusion that the trial court did not unreasonably determine there was the existence of a conspiracy at the time the challenged statements were made, we also must determine whether the statements themselves were made in furtherance of the conspiracy. We find that to be the case. As our supreme court stated in *Kliner*, 185 Ill. 2d at 141, a statement made in furtherance of a conspiracy includes any "that have the effect of advising" or "encouraging" the perpetration of the conspiracy. The statements made by Jaro, Maldonado, and Ruiz could all have reasonably served a purpose of advising the various gang members who were not present during the shooting (Perez, Andrew, and Fuentes) about the status of the conspiracy, *i.e.*, that defendant had killed a Latin King and, as a corollary, to expect retaliation. See, *e.g.*, *United States v. Mandell*, 752 F.3d 544, 552 (2d Cir. 2014) (for statements to be admissible under the nonhearsay coconspirator statement exception, they "need not be commands, but are admissible if they *** inform each other as to the progress or status of the conspiracy" (internal quotation marks omitted)). Furthermore, the statements could all have reasonably served a purpose of encouraging other gang members to participate in the ongoing conspiracy to harm members of the Latin Kings. The evidence revealed that Maldonado had bragged about the shooting and defendant, upon learning that he had shot a chief of the Latin Kings, smiled, laughed, and flashed the Two-Six gang sign. In this manner, the statements implicating defendant as the shooter and Maldonado as being involved could be interpreted as boosting their stature and reputation among the gang members as the ones involved in killing a chief of the Latin Kings and, thus, encouraging future acts of violence against the Latin Kings. Given these rationales for the statements, we cannot say the trial court was unreasonable in finding them made in furtherance of the ongoing conspiracy.

¶ 70        Defendant, however, highlights *People v. Wilson*, 302 Ill. App. 3d 499 (1998), and argues that bragging about a past crime cannot be considered in furtherance of a conspiracy. In *Wilson*, evidence at trial showed that the defendant and his codefendant, members of the Black Souls and Gangster Disciples gangs, respectively, had set fire to a building owned by a person who

owed the Black Souls money from selling drugs. *Id.* at 501-04. During the trial, the trial court allowed the State to introduce statements of the codefendant, who did not testify, to two people, where he talked about committing the crimes. *Id.* at 511. This court found the statements inadmissible as nonhearsay coconspirator statements because the codefendant made them after the crimes had been committed and they could not be "characterized as an attempt at concealment" but were simply the codefendant "bragging" about his involvement. *Id.* But, in *Wilson*, no evidence had been presented at trial that the burning of the building was part of a larger conspiracy, and thus, the codefendant's bragging about his involvement in the crimes could not reasonably be interpreted as having the effect of either advising about the status of the conspiracy or encouraging its perpetration. To the contrary, in this case, the statements of Maldonado, Ruiz, and Jaro can reasonably be interpreted as advising about the status of the conspiracy or encouraging the perpetration of the ongoing conspiracy to harm members of the Latin Kings.

¶ 71       Lastly, although not cited by either party, we highlight *People v. Donegan*, 2012 IL App (1st) 102325, ¶¶ 5-25, where the evidence at trial revealed that the defendant along with his codefendant, both members of the Four Corner Hustlers gang, shot and killed a member of the Gangster Disciples as part of an ongoing conflict between the gangs. During the trial, the trial court, without an objection from the defense, allowed the State to introduce statements made by the codefendant to another member of the Four Corner Hustlers that described the shooting, including that the defendant shot into a crowd of Gangster Disciples. *Id.* ¶¶ 17, 65.

¶ 72       On appeal, the defendant contended that his trial counsel was ineffective by failing to object to the statements' introduction on the basis that they did not qualify as nonhearsay coconspirator statements. *Id.* ¶ 65. This court found that the statements

> "should not have been admitted under the coconspirator's exception to the hearsay rule because they were made after the crime occurred and therefore were not in furtherance of a conspiracy and were not made in an effort to conceal the crime since they were, in fact, a recitation of the crime." *Id.* ¶ 67.

The court, however, found the statement was admissible as a tacit admission. *Id.* ¶ 68. Although the statements at issue here would appear to be similar to those deemed inadmissible in *Donegan*, the appellate court in *Donegan* was not reviewing whether the trial court had abused its discretion in allowing the statements to be admitted as nonhearsay coconspirator statements, a standard of review that is "highly deferential" to the trial court. See *People v. Peterson*, 2017 IL 120331, ¶ 125. Given our standard of review, and because the evidence both in the State's proffer to the trial court in support of its motion and at trial showed an ongoing gang conflict, the statements made by Jaro, Maldonado, and Ruiz can be interpreted as advising about the status of the conspiracy or encouraging its perpetration. Consequently, we cannot say that the trial court abused its discretion when it allowed the State to introduce them into evidence as nonhearsay coconspirator statements.

¶ 73                                    III. CONCLUSION

¶ 74       For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 75       Affirmed.

¶ 76    JUSTICE GORDON, dissenting:

¶ 77    I must respectfully dissent because it is obvious that the jury was confused and their questions clearly showed that confusion notwithstanding that the jury instructions given fully explained the applicable law. The State never claimed the theory of accountability, and in order to prove that defendant was the shooter, the State was required to prove defendant discharged a firearm because the victim was killed by a bullet. The "court must provide instruction when the jury has posed an explicit question or asked for clarification on a point of law arising from facts showing doubt or confusion." *People v. Averett*, 237 Ill. 2d 1, 24 (2010). As the majority sets forth in its opinion, "[w]hen a jury makes explicit its difficulties, the court should resolve them with specificity and accuracy." *People v. Childs*, 159 Ill. 2d 217, 229 (1994). The trial court did ask for a clarification, but the jury's response did not clarify anything and showed only more confusion. When they found defendant guilty of first degree murder and not guilty of discharging a firearm under the facts of this case, the confusion became even more apparent. The trial court had a duty to instruct the jury after their first note, or at least after the jury's lack of clarification, that defendant could not be guilty of first degree murder unless he was also guilty of discharging a firearm under the facts of this case.

¶ 78    I agree that the personal discharge of a firearm is not an academic element of the offense of first degree murder, but this case is not an academic problem. I further agree that the Illinois Supreme Court has found under certain circumstances there can be verdicts that appear to be inconsistent. However, common logic dictates that when there is no theory of accountability presented by the State, if the jury is confused, they must be properly instructed that, in order to prove defendant guilty of first degree murder in a shooting case, they are required to prove that the defendant had discharged a firearm. And if they are still confused, the court must say it again. The Illinois pattern jury instructions are useful, but they do not afford all of the answers that are required in every trial.

¶ 79    Here, the jury said in their notes (1) "Can we find guilty of first degree but not guilty of discharging and aggravated?" and (2) "Please define what is intended as an 'act' in first degree murder." The trial court responded to the first note by instructing the jury: "Please clarify your answer," and the trial court responded to the second note by telling the jury: "You have received the evidence and instructions. Please continue to deliberate." The jury then asked in a third note: "Are the three charges independent of each other? If not, which charges must be in tandem?" The trial court again told the jury: "You have received all of the evidence and the instructions. Please continue to deliberate." The jury needed to be instructed that defendant could not be guilty of either crime unless he personally discharged a firearm under the facts of this case. Simply put, the trial court should have re-read the following two jury instructions:

> "To sustain the charge of first degree murder, the State must prove the following propositions:
>
> > First: That the defendant performed the acts which caused the death of William Diaz; and
> >
> > Second: That when the defendant, did so, he intended to kill or do great bodily harm to William Diaz; or
> >
> > he knew that his acts would cause death to William Diaz; or
> >
> > he knew that his acts created a strong probability of death or great bodily harm to William Diaz.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty.

\*\*\*

To sustain the allegation made in connection with the offense of first degree murder, the State must prove the following proposition:

That during the commission of the offense of first degree murder, the defendant personally discharged a firearm that proximately caused death to another person. A person is considered to have 'personally discharged a firearm' when he, while armed with a firearm, knowingly and intentionally fires a firearm causing the ammunition projectile to be forcefully expelled from the firearm.

If you find from your consideration of all the evidence that the above proposition has been proved beyond a reasonable doubt, then you should sign the verdict form finding the allegation was proven.

If you find from your consideration of all the evidence that the above proposition has not been proved beyond a reasonable doubt, then you should sign the verdict form finding the allegation was not proven."

¶ 80    As a result, I must respectfully dissent because the trial court abused its discretion and defendant should be given a new trial. The confusion of the jury over the instruction resulted in this defendant not receiving a fair trial.